797 P.2d 1322

Wayne D. HUDSON,
Plaintiff–Appellant,

v.

Lyle R. COBBS, individually; and Jack Kennevick, individually; and Cobbs/Kennevick, a general partnership, Defendants–Respondents,

and

Larry Sundell, Brian Smith, Mark Bazeghi, Kathy Bazeghi, a/k/a Kathy Hampson and Doug Sherwood, all individually; and Webster Investments # 3, an Idaho general partnership, Defendants.

Larry SUNDELL,
Defendant–Cross–Claimant,

v.

Abbass BAZEGHI, Mark Bazeghi, and Kathy Bazeghi, a/k/a Kathy Hampson, Cross–Defendants.

Brian SMITH,
Defendant–Cross–Claimant,

v.

Mark BAZEGHI and Kathy Bazeghi, a/k/a Kathy Hampson, Cross–Defendants.

Lyle R. COBBS, Jack Kennevick and Cobbs/Kennevick, a general partnership, Defendants–Counterclaimants– Cross–Claimants–Respondents,

v.

Wayne D. HUDSON,
Counterdefendant–Appellant,

and

Abbass Bazeghi, Larry Sundell, Brian Smith, Mark Bazeghi, Kathy Bazeghi and Doug Sherwood, all individuals; and Webster Investments # 3, an Idaho general partnership, Cross–Defendants.

No. 16783.

Supreme Court of Idaho.

June 19, 1990.

Dissent on Denial of Rehearing
Sept. 21, 1990.

Kennedy & Thomas, Boise, for plaintiff-appellant. Fred Kennedy, argued.

Elam, Burke & Boyd, Boise, for defendants-respondents. Todd J. Wilcox, argued.

UPON REHEARING 1989 OPINION NO. 120, ISSUED AUGUST 11, 1989, IS HEREBY WITHDRAWN AND THIS OPINION IS SUBSTITUTED THEREFOR.

McDEVITT, Justice.

This case arose out of a complex real estate transaction and a series of agreements between: (1) Mark Bazeghi (the managing general partner acting on behalf of the Webster Investments #3 general partnership); (2) the Idaho First National Bank; (3) plaintiff Wayne D. Hudson; and (4) defendants Cobbs, Kennevick, and the Cobbs/Kennevick partnership.

The Webster #3 Partnership ("Webster #3") owned a tract of land in Boise called the Wildwood Center. This tract of land included the Wildwood Apartments and the Wildwood Office Buildings. On August 1, 1980, Webster #3 obtained a $580,000 loan from Idaho First to finance construction of the office buildings on the Wildwood property. Interest was payable on July 1, 1981. Under the terms of the loan agreement, the loan was convertible to long-term financing only if the office building was pre-leased to the extent of 12,210 square feet prior to July 1, 1981.

On August 26, 1980, six days after entering into the loan agreement with Idaho First, Webster #3 entered into an earnest money agreement to sell Wildwood to Wayne Hudson. On October 16, 1980, one day prior to the date set for closing, Webster #3 and Hudson modified their contract. Webster #3 assumed direct responsibility to meet the bank's pre-leasing requirements so that the loan could be converted to long-term financing for Hudson. Hudson agreed to assume the note with Idaho First.

On March 17, 1981, in an effort to fulfill Webster #3's pre-lease requirements, Abbass Bazeghi, Webster #3's managing partner, procured lease agreements with the Cobbs/Kennevick Partnership for two office suites.[1] Contemporaneous to execution of the leases, Bazeghi and the Cobbs/Kennevick Partnership entered "hold harmless" agreements, whereby Bazeghi agreed to pay the rent on Cobbs's and Kennevick's spaces if Cobbs and Kennevick failed to occupy or sublet the spaces by July 1, 1981. This provision was designed to "save" Cobbs and Kennevick from any payments and other economic detriments that could arise from their execution of the leases. The hold-harmless agreements were not attached to the leases, they were not provided to either the Bank or to Hudson, nor were either advised of their existence. Neither Bazeghi, Cobbs nor Kennevick informed Hudson of the hold harmless agreements.

At trial Cobbs and Kennevick testified that the leases were "straw" leases which they did not intend to be bound by, and that they executed them solely to accommodate Bazeghi in meeting his tenancy obligations. Hudson testified that he was aware that the leases were "accommodation leases" for the purpose of obtaining the desired long term financing and he was aware that Cobbs/Kennevick would not occupy the space, but he was not informed that the lease payments would not be made by Cobbs/Kennevick or by sub-tenants who were yet to be procured.

Based on the lease package submitted by Mark Bazeghi, the Bank approved the long-term financing in July, 1981. On June 24, 1981, Hudson and Webster #3 entered into an additional agreement. The June 24 agreement recited that long term financing was available but was conditioned upon obtaining lease commitments of $9,983.83 per month for three years. This agreement stated that:

> Cobbs and Jack Kennevick individually. Thus, the indication is that Cobbs and Kennevick were bound as individuals and as partners in the Cobbs/Kennevick partnership.

1. In the lease agreements the lessee was denominated as the Cobbs/Kennevick partnership; however, the signature pages and an amendment dated April 4, 1981, were signed by Lyle

Webster has met this financing condition by obtaining signed full service leases for 12,213 sq. ft. with total rental of $9,983.83 per month. The lessees under these leases may or may not actually occupy the space for which they are obligated. Webster will guarantee rent payments as per these leases from 7/1/81, until occupied or 6/30/84, whichever comes first....

On July 1, 1981, (the date of the bank deadline for the loan conversion), Webster # 3 (through Bazeghi) and Hudson entered into their final agreement. Webster # 3 agreed to pay rent on any pre-leased space not actually occupied by lessees or sub-lessees. Cobbs and Kennevick were among those who had not occupied or subleased the premises by July 1, 1981.

Pursuant to the June 24 agreement, Webster # 3 managed the building and provided Hudson monthly rental payments. However, Hudson received no payments or accountings for January, February, or March, 1982. As a result, Hudson fired Webster # 3, sued for back rent, and demanded that Cobbs and Kennevick pay their rent. In July, 1982, Hudson was informed that Cobbs/Kennevick contended the leases were not enforceable as against them. At that time he also became aware of the hold-harmless agreements, listed the building for sale, and stopped making payments on the long-term note.

By letter dated August 3, 1982, Wayne Hudson tendered the office building back to Webster # 3 and demanded restitution of all money paid by him. He notified the Webster # 3 partners, Lyle Cobbs, and Jack Kennevick that he had defaulted on the loan and had listed the property for sale with Commercial Brokerage Company.

Hudson was unable to sell the Wildwood Office Building although he made considerable effort to do so. On January 17, 1983, Idaho First National Bank purchased the property at the foreclosure sale. No deficiency was sought.

Hudson filed his original complaint in May 1982, alleging Cobbs, Kennevick and the Cobbs/Kennevick Partnership breached the lease agreements by failing to pay their rent. Hudson also alleged breach of a contract guarantee for failure to pay rent as against Webster # 3 and its partners. A writ of attachment hearing was conducted on July 27, 1982, at which time Hudson first learned of the existence of the hold harmless agreements. Subsequently, Hudson amended his complaint by adding an allegation of fraud. Later, Hudson again amended his complaint alleging that Webster # 3, its partners, and Cobbs and Kennevick violated the Racketeering Act, I.C. §§ 18–7801 thru –05. At trial, Hudson proceeded on four basic causes of action:

1. Common law fraud against Cobbs, Kennevick and Mark Bazeghi.

2. Negligence against Cobbs and Kennevick and the Cobbs/Kennevick partnership.

3. Rescission against Webster Investments # 3 and its individual partners, based upon a material breach of its obligation to meet the pre-leasing requirements for long term financing and its obligation to guarantee lease payments pursuant to the agreement entered on June 24, 1981.

4. Fraud against Webster # 3 and its partners.

Two claims, based on the federal Racketeer Influenced and Corrupt Organizations Act and the Idaho Racketeering Act, were dismissed prior to trial. The trial court dismissed the Idaho Racketeering Act claim in its Summary Judgment Order filed October 29, 1985, prior to trial. While Hudson's federal RICO claim survived summary judgment, he dismissed it prior to trial.

At the close of the jury trial on Hudson's fraud and negligent misrepresentation action, Cobbs and Kennevick moved for a directed verdict. The court denied this motion and submitted the case to the jury on both theories of fraud and negligent misrepresentation. The jury found for Cobbs and Kennevick on the fraud cause of action. However, it found in special verdicts for Hudson on the negligent misrepresentation cause of action against Cobbs, Kennevick and the Cobbs/Kennevick Partnership

and Mark Bazeghi. The jury attributed 25% of the negligence to the Cobbs/Kennevick Partnership, the remaining 75% being attributed to Webster # 3, with zero negligence being attributed to Hudson. The jury awarded Hudson $513,-909.09 as compensatory damages, $163,-391.98 of which consisted of attorney fees.

Cobbs and Kennevick timely moved for a judgment n.o.v. Although the trial court had denied their motion for a directed verdict, it granted the motion for judgment notwithstanding the verdict approximately seven months after entering judgment against the defendants on the jury verdict. The court ruled that negligent misrepresentation was not at present a viable cause of action in Idaho, no Idaho appellate decision having recognized the tort. It further ruled that even if such a tort were recognized in Idaho, the evidence did not support a finding for Hudson on that theory. The court ruled that it had erred in allowing the negligent misrepresentation claim to proceed to the jury. Thereafter, the court denied Hudson's motion for a new trial, and his motion to amend the judgment n.o.v. Hudson appeals.

## I. NEGLIGENT MISREPRESENTATION

In *Idaho Bank & Trust Co. v. First Bancorp of Idaho*, 115 Idaho 1082, 772 P.2d 720 (1989), the Idaho Supreme Court recognized the tort of negligent misrepresentation in the area of accountants' liability to non-contractual third parties. In reaching its decision, the Supreme Court first noted that the New York, Court of Appeals, in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), "refused to hold. [an] auditor liable to all persons who foreseeably would rely on ... negligently audited financial statements, ..." *Idaho Bank & Trust Co.*, 772 P.2d at 721. The Supreme Court then recognized that "[o]ther jurisdictions have departed from the doctrine of *Ultramares*, holding that public accountants may be liable to third parties, not always precisely identifiable,

but who belong to a limited class of persons whose reliance on the accountant's representations is specifically foreseen." *Id.* at 722. Finally, and most significantly for this case, the Supreme Court cited the New York Court of Appeals opinion in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), noting that the *Credit Alliance* court:

"has reaffirmed the basic principles articulated in *Ultramares*, but has interpreted the *Ultramares* doctrine [2] to include non-contractual parties when certain other prerequisites are satisfied, *i.e.*,

1. the accountants must ahve [sic] been aware that the financial reports were to be used for a particular purpose or purposes;

2. in the furtherance of which a known party or parties was intended to rely; and

3. there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Credit Alliance v. Arthur Andersen & Co., id.* 493 N.Y.S.2d at 443, 483 N.E.2d at 118.

Hence, the New York court has expanded its traditional rule set forth in *Ultramares*. We agree and adopt the extension of the traditional rule as expounded in *Credit Alliance*."
*Idaho Bank & Trust Co.*, 772 P.2d at 722.

After adopting the *Credit Alliance* test, this Court declined the plaintiff's request to adopt the definition of negligent misrepresentation found in section 552 of the *Restatement (Second) of Torts. Idaho Bank & Trust Co.* 772 P.2d at 722.

In the instant case, the district court ruled that negligent misrepresentation was not a viable cause of action in Idaho, and that even if it were, two factors prevent its application in this case. First, Cobbs's and Kennevick's only duty to Hudson arose

---

**2.** Specifically, the *Ultramares* doctrine was that the public accountants could only be held liable

to the other party to the contract of engagement.

from a lease agreement contract. Therefore, Hudson's proper cause of action was for their breach of contract, not negligent misrepresentation. Secondly, the "pecuniary interest" element of negligent misrepresentation under the *Restatement (Second) of Torts*, § 552, was not present in this case.

■ We need not address whether the issue of pecuniary interest provided a sufficient basis for the court's judgment n.o.v. because the court was correct in ruling that the facts of this case were not sufficient to show the duty necessary to make out a prima facie case for negligent misrepresentation. The duty that Cobbs and Kennevick allegedly breached was a duty created by contract. In *Carroll v. United Steelworkers of America*, 107 Idaho 717, 692 P.2d 361 (1984), the Idaho Supreme Court stated that it is well settled that:

> an alleged failure to perform a contractual obligation is not actionable in tort.... "To found an action in tort, there must be a breach of duty apart from *non-performance* of a contract." [Quoting *Taylor v. Herbold*, 94 Idaho 133, 483 P.2d 664 (1971) ].... Mere nonfeasance, even if it amounts to a willful neglect to perform the contract, is insufficient to establish a duty in tort.

*Carroll*, 107 Idaho at 719, 692 P.2d at 363 (footnote omitted, emphasis in original). *See also Steiner Corp. v. American Dist. Tel.*, 106 Idaho 787, 683 P.2d 435 (1984); *Browns Tie & Lumber Co. v. Chicago Title Co.*, 115 Idaho 56, 764 P.2d 423 (1988).

As noted by the district court, neither Cobbs nor Kennevick, nor the Cobbs/Kennevick partnership had any affirmative duty to Hudson other than the duty created by their lease agreement. Thus, while Hudson could have sued Cobbs/Kennevick in contract for breach of their lease agreement, he had no cause of action in tort.

■ As pecuniary interest is not an element of this Court's definition of negligent misrepresentation, the district court's finding that Cobbs and Kennevick had no pecuniary interest would, by itself, be an insufficient basis for the court's judgment n.o.v.

However, the fact that Hudson's claim for relief lay in breach of contract rather than negligent misrepresentation is all the reason that is needed to hold that the district court's judgment n.o.v. was proper.

This leads to the issue raised by Cobbs and Kennevick on rehearing; whether or not the district court's judgment n.o.v. should be reinstated as opposed to ordering a new trial.

## II. JUDGMENT N.O.V.—NEW TRIAL

In ruling on a motion for judgment n.o.v., the trial court must view the facts as if the moving party has admitted the truth of all the non-moving parties evidence. I.R.C.P. 50(b); *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194 (1974); *Quick v. Crane*, 111 Idaho 759, 763, 727 P.2d 1187 (1986). If, after reviewing the evidence in this manner, the court finds that the evidence is of sufficient quantity and probative value that reasonable minds could have reached the same conclusion as did the jury, then the jury's verdict will be upheld. *Quick v. Crane; Smith v. Praegitzer*, 113 Idaho 887, 749 P.2d 1012 (Ct. App.1988) *review denied*, 116 Idaho 467, 776 P.2d 829 (1988). Furthermore, the determination of whether the evidence before the Court considering the judgment n.o.v. is sufficient to create an issue of fact is purely a question of law. *Quick v. Crane*, 111 Idaho at 759, 727 P.2d at 1187 (1986). And, in determining whether a judgment n.o.v. should have been granted, the appellate court applies the same standard as does the trial court which originally ruled on the motion. *Id.*

■ Hudson's proper cause of action was in contract, not tort. Accordingly, as a matter of law, we must hold that the judgment n.o.v. was proper. It could be argued that the negligent misrepresentation cause of action should never have been submitted to the jury. However true this might be, it does not affect the validity of the trial court's judgment n.o.v. A motion for judgment n.o.v. has been described as a delayed motion for directed verdict and it can be used by the district court to correct its

error in denying a directed verdict. *Hibbler v. Fisher*, 109 Idaho 1007, 712 P.2d 708 (Ct.App.1985).

In conclusion, this Court holds that although negligent misrepresentation, as recognized in *Idaho Bank & Trust Co. v. First Bancorp of Idaho*, 115 Idaho at 1082, 772 P.2d at 720 (1989), is a viable cause of action in Idaho, the trial court's judgment n.o.v. was proper.

Costs are awarded to respondents.

BAKES, C.J., and JOHNSON, BOYLE, JJ., concur.

BISTLINE, Justice, dissenting:

### I.

With all due respect to Justice Huntley and to Justice McDevitt for the light which they were able to shed upon the facts and circumstances of this case,[3] it was a highly experienced and extremely able practicing attorney who shed the most helpful illumination on the most troublesome aspect of the case. When I became first embroiled, which was only after Justice Huntley had resigned and Justice Shepard had died, and after two of the surviving justices awarded a rehearing, my approach was to first read the exhaustive history of the case furnished in the district court's memorandum decision which, inter alia, granted the Cobbs/Kennevick motion for judgment n.o.v. On more than just one close reading of that opinion, it appeared to me that the jury should not have been instructed at all on negligent misrepresentation. Moreover, the instructions on actual fraud were inappropriate in that the facts and circumstances, as well-portrayed by the district court, did *not* even tend to demonstrate a case of actual fraud, *i.e.*, fraud in the inducement, but rather were demonstrably indicative of constructive fraud.[4] I say this as to the actions of Cobbs, Kennevick, and Bazeghi in the dealings with Wayne Hudson, which is not to say that the bank was not the primary and initial intended recipient of the deceptive scheme, because it was. However, the harm the bank might suffer would be only in giving long-term financing. It would not be in danger of losing its security, and could foreclose at will, which it did. Hudson, on the other hand, was apparently trying to acquire a long-term investment, and was putting up front what may have been a lifetime savings.

Returning to the illumination shed by Peter Boyd, Esq., on the trial court's rather unusual (but certainly permissible where appropriate) action in reversing itself on the earlier denial of the Cobbs/Kennevick motion for a directed verdict, he pointed to eleven specific errors in law occurring at trial, the first of which needs exploring. This I say because, from my reading of the district court's comprehensive memorandum decision, nothing therein showed me that the court properly instructed on negligent misrepresentation. The court was under a duty to instruct on the plaintiff's proffered theory of failure to make disclosure and resultant constructive fraud. *Everton v. Blair*, 99 Idaho 14, 576 P.2d 585 (1978). Here the plaintiff showed kindness in not alleging intentional nondisclosure, but only that the failure to disclose was negligence.

Recently, in August 1989, in *Powell v. Nietmann*, 116 Idaho 590, 778 P.2d 340 (1989), my separate writing emphasized the application to that case of precedent previously established in *Blinzler v. Andrews*, 94 Idaho 215, 485 P.2d 957 (1971); *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966); *Tusch Enterprises v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987); and the Restatement (Second) of Torts § 551. The Restatement was being advanced by Jus-

---

**3.** To illustrate the procedural morass which this controversy became involved in, there were twenty-seven volumes of record amassed before the case came at issue on the plaintiff's third amended complaint and the pleadings responsive thereto.

**4.** What was plainly visible to me was a prima facie case of constructive fraud of which Wayne Hudson became victim by reason of the non-disclosure to him that the Suite 101 and 103 leases were absolutely bogus, and "The Professionals" lease of Suite 102 was at the least presumably likewise, all three leases being fabricated to placate the bank's requirements.

tice Taylor for a unanimous Court in *Beth-lahmy*, and thereafter reaffirmed by Justice Donaldson in *Tusch*, all having to do with the duty or obligation to disclose, and consequent liability in constructive fraud for failure to do so. Portions of my opinion in *Powell* are marked Appendix A, and attached hereto.

The first error designated by Mr. Boyd is concise, but very well taken, and is apparently what may have in part brought about the district court's reversing itself. Mr. Boyd very straight-forwardly asserted: "1. The trial court erred in submitting the case to the jury on the theory of negligent misrepresentation *which was neither pleaded nor tried with the consent of either party.*" R. 1674 (emphasis added).[5] Mr. Boyd expanded on that assignment of error in a memorandum brief filed with the district court, and it, too, is instructive:

> This case was tried to the court and jury on plaintiff's third amended complaint which pled liability against defendants on theories of fraud, breach of contract, *and simple negligence.* At the close of evidence, the court directed a verdict on plaintiff's simple negligence claims. With that exception, the court submitted the case to the jury on all plaintiff's theories of liability, *but on its own* motion, also instructed on the separate tort of negligent misrepresentation.[6]

> *The parties* did not try that claim by implied consent and, in fact, *all objected to submitting the negligent misrepresentation issue to the jury.* In opposing

the instruction, plaintiff's counsel advised the court that it had been their intent to plead simple negligence only, *based on the failure to give notice to Wayne Hudson* and based on alleged negligence in conferring apparent authority on Mark Bazeghi.[7] Plaintiff also urged professional malpractice against Lyle Cobbs in connection with the lease to The Professionals, Inc.

R. 1678–79 (emphasis added).

Significantly, Mr. Boyd's motion was entitled:

MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, OR IN THE ALTERNATIVE FOR A NEW TRIAL.

R. 1669. In the body of the motion, he explained to the district court, "[i]n the alternative, defendants move the court to enter its order granting them a new trial. This Motion is based upon I.R.C.P. 59(a)(6) and I.R.C.P. 59(a)(7) for the reasons there is insufficient evidence to support the verdict, it is contrary to law and because errors in law occurred at trial, as more particularly set forth below." R. 1670. There followed specification of error No. 1, hereinabove set out, and ten other assignments of trial court error, all of which were discussed in the supporting brief. Mr. Boyd's brief discussed all eleven of the specifications of error, but concerned here is only specification of error No. 1, and his elaboration thereon found in the supporting brief.[8]

---

**5.** Attached hereto as Appendix B are the salient allegations of the plaintiff's third amended complaint. It will be noted that Mr. Boyd was absolutely correct in reminding the court as to the plaintiff's theory *not* being negligent misrepresentation. I–36, I–37, and I–38 are the allegations of nondisclosure.

**6.** Mr. Boyd's statement is also squarely in line with the reporter's transcript of the instructions conference, attended by Mr. Eismann for the plaintiff. *See* Appendix C, attached hereto.

**7.** Mr. Boyd's statement squares exactly with the plaintiff's final complaint. *See* Appendix B, attached hereto.

**8.** Of additional significance is an affidavit which Mr. Boyd filed contemporaneously with the filing of his alternative motion for entry of judgment n.o.v., or for new trial, the contents of

which he avers is made of his own personal knowledge. His affidavit states that the court accepted a proposed form of judgment presented by one of Hudson's trial counsel, modified it, and entered it of record, all without giving defense counsel any opportunity to review its content or form or to register an objection. His lament was that it was based solely on the jury's verdict, and not upon separate findings and conclusions of the court, whereas he, Mr. Boyd, was:

> [U]nder the belief, based on the court's comments during the course of the trial, that the jury verdict rendered ... was advisory only, *equity having taken jurisdiction over the entire case* because plaintiff's dominant claim for *relief sounded in equity.*

> ....

> I raised all of these objections to the court via telephone conference call on December 16,

Exactly what the district court made of Mr. Boyd's motion is not readily discernible. It is seen that after having declared the error in submitting the issue of negligent misrepresentation to the jury, instead of just dropping that theory as a dead issue, the court resorted to application of the "pecuniary interest" mentioned in the Restatement (Second) of Torts § 552, concluding that "the proof did not establish the type of relationship which justifies the imposition of the duty not to make a negligent misrepresentation." R. 1866.

When one knows, as any reader now does, that both parties objected to the court's instructing on negligent misrepresentation, it is difficult to readily accept as a valid premise for granting judgment n.o.v. that the district court, acting in retrospect, and without the slightest mention that *both* parties objected as aforesaid, insisted on making a ruling that the proof was insufficient to prove a negligent misrepresentation. It was a needless and futile exercise. When the court received Mr. Boyd's motion, supporting brief, and affidavit, the court in good grace should have acknowledged that the objections to instructing on negligent misrepresentation had been made, and the court had erred. Nevertheless, having determined *sua sponte* that the theory of negligent misrepresentation should be given to the jury, the district court's erroneous (and obdurate) reaction was to reexamine the evidence for sufficiency to prove negligent misrepresentation, the theory the court preferred.

An expression of judicial regret would not have been out of order. Respect can be a two-way street in trial skirmishes between court and counsel. What is seen here appears to be a district court rather stubbornly insisting on so instructing the jury, and then, on later being directly but temperately confronted with the error, ignoring the challenge in favor of what appears to be a face-saving grant of the motion for judgment n.o.v. on the basis that negligent misrepresentation was not proven. That grant was also premised on the slender, slender reed that the only duty owed by Cobbs and Kennevick was to pay rent. Better that the court would have simply admitted error in so instructing over the objections of both parties. The court should have declared that the court's error required the grant of a new trial as the only manner in which both parties could be treated fairly and evenly. There was, of course, other paramount error inflicted on the plaintiff in not instructing on failure to disclose as per its definition in Idaho case law.

Looking again at the trial court's memorandum decision, which was first read at the outset of my involvement, it is noted that the district court strangely made the statement that "[a]t the time of the discussion of the jury instructions, the defendants Cobbs and Kennevick objected to instructing the jury on negligent misrepresentation." R. 1861. This concession was not further pursued by the court, although it bears out to a 50 percent extent what Mr. Boyd had urged in his post-judgment alternate motions. But, having gone that one small step, no reason appears why the court would not divulge that it so instructed over objections of *both* parties.[9] This became all the more interesting when the court stated, in the sentence following the statement that the defendants did not want the jury to be instructed on negligent misrepresentation, that "[n]o Idaho appellate decision recognizes the tort of negligent misrepresentation." R. 1861. Why this court responded negatively to Mr. Eismann's cautionary remark [*see* Appendix C] is not understood. Why this case was selected to be the guinea pig for making new law is not understood. The case was already rife with complexities of parties, the-

---

1985, and for these reasons respectfully move that the judgment of the court entered December 17, 1985, be declared void *ab initio.* R. 1674–76 (emphasis added). This motion and its sworn contents received no mention in the district court's memorandum decision, nor in today's majority opinion.

**9.** *See* Appendix C, which demonstrates that Mr. Eismann, for plaintiff, was insisting on the giving of the simple negligence instruction and did object to instructing on negligent misrepresentation. It was an astute counselor who advised the court against pioneering.

ories, and cross actions among the defendants.

Incomprehensibly, on the very next page, after the balance of page 1861 was consumed in a nonproductive discussion of *Stewart Title of Idaho v. Nampa Land Title,* 110 Idaho 330, 715 P.2d 1000 (1986), and a display of the contents of the Restatement (Second) of Torts § *552,* the court stated that before discussing "the issues revolving around the tort of negligent misrepresentation, it must first consider whether it is even permissible in this case. Certainly it is not, at present, a recognized cause of action in Idaho." R. 1861–62. Again one wonders, why force that issue in this case? And why belabor it after the jury is in?

Pages 1862 and 1863 of the memorandum decision discuss the factual circumstances, one of which was that Cobbs and Kennewick "could not have escaped liability for the rental obligations under the leases had Mr. Hudson chosen to pursue them under a breach of contract theory." R. 1863.[10] Pursuing Cobbs and Kennewick for rentals, which pursuit they might be pecuniarily able to resist *ad infinitum,* and otherwise deny, might be a futile and costly venture.

Obviously the court had to be of the mind that Cobbs/Kennevick were being nice guys, who at Bazeghi's request would sign admittedly bogus leases, knowing that those documents would influence a bank to make a long-term financing loan. Those documents could also influence a potential buyer of the office building, the larger area of which was ostensibly rented to three bona fide lessees, but the court saw no fault in the failure of Cobbs/Kennevick to put either the bank or Hudson on notice

(failure to disclose) that the leases were bogus—a fact known only to Cobbs, Kennevick, and Bazeghi. The jury saw it otherwise.

## II.

After the district court concluded that the bogus leases rendered Cobbs and Kennevick liable to pay the rent, and only that, and specifically were not liable in an action for tort based on a breached contractual duty, it then digressed into a discussion of the tort of negligent misrepresentation. A discussion of the applicability, or better stated, the nonapplicability of the Restatement Second of Torts, § 552, was apparently intended as substantiation for what was being written, but strangely this discussion did not pay even lip service to the Restatement Second of Torts, § 551, which this Court relied upon in *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966), and again in *Tusch Enterprises v. Coffin,* 113 Idaho 37, 740 P.2d 1022 (1987), the latter being a case eleven years more recent than *Bethlahmy.* Justice Donaldson in writing *Tusch* wholly approved of *Bethlahmy,* and quoted extensively from it. As to the misrepresentation there involved, he wrote:

> It must also be considered whether the facts here fall within the category of cases finding a misrepresentation on the basis of nondisclosure.

*Tusch Enterprises v. Coffin,* 113 Idaho 37, 41–2, 740 P.2d 1022, 1026–27 (1987) (emphasis added). The balance of a section of the *Tusch* opinion is applicable to our review, and as Appendix D, is attached hereto.

The district court did commit error in seizing upon the "negligent misrepresentation" theory as a proper instruction for the jury, but it may have been readily correct-

---

**10.** Somewhat naively, the court could only so write, after it had just written and found "that Wayne Hudson's name was on the leases as lessor when Cobbs and Kennewick signed them." As written, this suggests, as is the case, that a serious and perhaps insurmountable defense existed for any cause of action on the leases, and *the defense might have prevailed.* The court also did not consider that a convincing liar could have convinced a jury or judge that Hudson was at all times aware of the secret agreement between Cobbs, Kennewick, and Bazeghi, and acquiesced in their scheme to obtain the coveted long-term financing. Considering that possibility, what would Hudson's action for lease payments gain him? Why would he bother for trifling amounts when his real concern was much greater, namely to retreat from a transaction in which the bank itself could have readily retreated at any time it found that it had been deceived by the phonied-up Cobbs/Kennewick lease agreements, and might or might not believe that Wayne Hudson was *particeps criminis.*

able error, as will be discussed, *infra*. As to the self-claimed error, there could not have been another set of facts which would have presented a better candidate for instructing the jury in accordance with the provisions of the Restatement Second of Torts, § 551, which is well-established in Idaho jurisprudence. The discussion by the trial court of § 552 was not germane, because no instruction should have been given on negligent misrepresentation.

Negligent misrepresentation was *not* plaintiff's theory of liability. The plaintiff's theory of liability was predicated on Idaho's viable and well-recognized theory of nondisclosure, and whether it be intentional or negligent is of no consequence as to liability, other than that where it is intentional the perpetrator subjects himself to the assessment of punitive damages. What matters here is that the defendants, Bazeghi, Cobbs, and Kennevick, involving also the Cobbs/Kennevick partnership, contrived and connived to put into existence two leases which outwardly presented a "facial" validity (as the district court so observed, R. 1835), in order to obtain the bank's long-term financing. A finding by the district court is convincingly clear on that point: "The agreement between Mark Bazeghi and the Cobbs/Kennevick partnership was that Cobbs/Kennevick would sign leases which appeared to be valid leases so that the bank would approve the financing because it would appear that the pre-leasing requirement had been met." R. 1836. Equally clear, and cementing the *particeps criminis* intent and attitude of the three conspirators is the district court's finding which followed directly in line with the above: "Contemporaneously, Mark Bazeghi entered into hold-harmless agreements between himself and Cobbs/Kennevick to hold them harmless from any claims arising from the leases and to be liable for the rent if Cobbs/Kennevick did not occupy the premises or sublet them by July 1, 1981. Exh. 30, 31." R. 1836. Then followed the finding which displayed the determination of those three gentlemen to not disclose,

either to the bank, or to Hudson: "The *hold-harmless agreements* were not attached to the leases, they *were not provided to either the bank or to the plaintiff, nor were either advised of their existence....*" R. 1836 (emphasis added). A further finding of the district court established that the three men were aware that the "facially valid" leases would also help along the Bazeghi scheme to sell the office building to Hudson:

Lyle Cobbs testified that at the time he entered into the lease he thought that an earnest money agreement was on the property and that there was a buyer or potential buyer. He knew, as did Jack Kennevick, that if enough square footage were leased that long-term financing had been approved and guaranteed by the Bank. He testified that *Mark Bazeghi told him that there was a purchaser who desired to buy the building* and that he was trying to get the building leased so that long-term financing could be consummated.

R. 1837 (emphasis added).

With those facts and circumstances outlined by the trial court being also self-evident from independently reviewing the record, at a glance it appears that Wayne Hudson had a prima facie case of fraudulent non-disclosure against Bazeghi, Cobbs, and Kennevick. (But in his pleadings Hudson graciously called it negligent nondisclosure.) Such a prima facie case could be based on the reckless or careless indifference displayed by Cobbs and Kennevick that the spurious leases would be used to beguile the bank into granting long-term financing, and also could be used to encourage Hudson into purchasing the office building from Webster # 3 Partnership and/or Wildwood Associates, as the case might be. Even were there manifested no objective intent to defraud Hudson, or the bank, the course of conduct would in the eyes of the law amount to constructive fraud, provided only that the bank and/or Hudson, or both, were deceived into consummating the transaction.[11]

---

**11.** *See* Appendix E, which includes the Black's Law Dictionary definition of fraud, as well as a short statement of the law of fraud in Idaho.

Compounding the court's error in choosing to instruct on negligent misrepresentation is the wording of the instructions given to the jury on the special verdict form. First the court explained that some questions dealt with the issue of fraud, and others did not:

In this case you will return a special verdict, consisting of a series of questions which you should answer. There are individual questions concerning the contentions of the various parties in this case, the conduct of the parties and other specific questions about the amount of damages which may be awarded to the Plaintiff. Except for those questions dealing specifically with the alleged acts of fraud on the part of certain named Defendants, in answering each question, you must be persuaded, considering all the evidence in the case, that your choice of answers is more probably true than not true. With respect to those questions dealing specifically with the alleged acts of fraud on the part of certain named defendants, in order to answer each such question in the affirmative, you must find that the allegations of fraud, as hereinafter defined, have been established by clear and convincing evidence.

R. 1506. But as is seen in examining the questions on the fraud in the inducement issue, some instructions required clear and convincing evidence, but others did not:

QUESTION NO. 1(a): Did defendants Lyle R. Cobbs, Jack Kennevick and Mark Bazeghi enter into a common plan or scheme to fraudulently induce Plaintiff into entering into the June 24, 1981 agreement? (By clear and convincing evidence)

. . . .

QUESTION NO. 2: Did Defendant Mark Bazeghi fraudulently induce Plaintiff into entering into the June 24, 1981 agreement?

. . . .

QUESTION NO. 3: Did Defendant Cobbs/Kennevick Partnership fraudulently induce Plaintiff into entering into the June 24, 1981 agreement? (By clear and convincing evidence)

. . . .

QUESTION NO. 4(a): Did Defendant Lyle R. Cobbs fraudulently induce Plaintiff into entering into the June 24, 1981 agreement?

. . . .

QUESTION NO. 4(b): Did Defendant Jack Kennevick fraudulently induce Plaintiff into entering into the June 24, 1981 agreement? (By clear and convincing evidence)

. . . .

QUESTION 5: If you have found that Plaintiff was fraudulently induced into entering into the June 24, 1981 agreement and that Plaintiff suffered damage, was such conduct on the part of the above-named Defendants a proximate cause of damage to the Plaintiff? (By clear and convincing evidence)

. . . .

QUESTION 6: Did Defendant Webster Investments # 3 Partnership, acting by and through its managing partner, Mark Bazeghi, fraudulently induce Plaintiff into entering into the June 24, 1981 agreement? (By clear and convincing evidence)

. . . .

QUESTION NO. 7: If you have found that Plaintiff was fraudulently induced into entering into the June 24, 1981 agreement and that Plaintiff suffered damage, was such conduct on the part of Defendant Webster Investments # 3 Partnership a proximate cause of damage to the Plaintiff? (By clear and convincing evidence)

. . . .

QUESTION NO. 10: Was there negligence on the part of Wayne Hudson which was a proximate cause of the damages sustained by him?

. . . .

QUESTION NO. 11: Was there negligent misrepresentation on the part of the defendant Mark Bazeghi which was a proximate cause of the damage claimed by Wayne Hudson?

. . . .

QUESTION NO. 12: Was there negligent misrepresentation on the part of the defendants Lyle Cobbs and Jack Kennevick and the Cobbs/Kennevick partnership which was a proximate cause of the damages claimed by Wayne Hudson?

R. 1506–13.

All of the first eight questions are couched in terms of fraud in the inducement. Fraud in the inducement is not readily proven, and it is no great wonderment that the jury did not pause long on the issue of fraud. First of all, it has to be remembered that the jury did find for Hudson on the issue of negligent misrepresentation. Where the jury very well may have thought itself achieving justice with that verdict, it would naturally have a lessened interest in other theories of liability, especially when it had found the same monetary liability, $513,909, on the rescission issue. But a more likely probability is that there was not any evidence that Hudson was ever directly exposed to Cobbs and Kennevick. Cobbs and Kennevick were never positioned to induce him, and there was no evidence to suggest that either of them was in the habit of fraudulently inducing, or that either even knew what the term meant prior to finding themselves as named defendants in a sizeable lawsuit.

A problem with the questions asked on the special verdict, relative to actual fraud, *i.e.*, fraud in the inducement, was the failure to define it, or to give the jury some understanding of what is meant by "induce." Black's Law Dictionary suggests seeing "seduce," which is helpful. The words as to what may accomplish the purpose are practically the same, and only the objectives differ. Generally one induces or seduces by persuasion or influence, according to Webster, while according to Black's the meaning is expressed in terms of bringing on or about, causing, leading by persuasion or reasoning. Presently it seems that no inducing of fraud could be attributed to Cobbs or Kennevick. Rather, perhaps they were as much the inducees as was Wayne Hudson, but perhaps *culpably* all too willing to aid Bazeghi. In that respect, the evidence strongly illustrates that their culpability was in negligence, the

very case theory which counsel for Hudson pleaded—only to have the district court discount and discard it in favor of the law clerk's research showing that negligent misrepresentation would better suit Hudson's case than the simple negligence that his much-esteemed, experienced and capable counsel had elected. As to questions 10, 11, and 12 of the special verdict, the jury absolved Wayne Hudson of negligence, but not so with regard to Bazeghi, Cobbs, and Kennevick, the latter-named two both individually and as a partnership. A valid assignment of error is that the court was remiss in not finding all three co-conspirators jointly and severally liable. Had they not all participated in the execution of the leases, there would have been no deception practiced on the bank or on Wayne Hudson.

The thrust of Hudson's action was *not* the piddling one of seeking a judgment for accrued rent on the basis of a lease which possibly created a contractual obligation to pay rent. When the news was out that the "purported" lease was indeed spurious, and had for its purpose to deceive the bank into approving long-term financing, there was no reason for Hudson to risk ratifying the fraud by suing on a lease which was bogus. On learning that the leases were spurious, there would have been little reason for Hudson to do other than what he did do, namely, timely rescind and commence legal action. Under the law as it has existed for many, many years, Hudson could not do otherwise, and specifically would have been inconsistent in attempting to gather in the fruits of the two spurious leases, and at the same time in the eyes of the bank appearing to be *particeps criminis* with Bazeghi, Kennevick, and Cobbs.

Early on in the memorandum decision, R. 1841, the district court found that "[b]ased on the lease package submitted by Mark Bazeghi, the bank approved the long-term financing in June, 1981." In no way could Mr. Hudson, in an exercise of ordinary respect for other persons, including banks, sit idly by without blowing the whistle, once he found out that up until then he had been used as an unwitting pawn in the

Bazeghi coup aimed at securing the all-important long-term financing, the absence of which would have left Bazeghi, et al., in serious circumstances. Obviously Bazeghi was intent on accomplishing two objectives: (1) obtaining long-term financing not matter what else, and (2) passing the property off to Hudson in return for his money. Cobbs and Kennevick were alleged to have been negligent in affixing their signatures at Bazeghi's request.

The district court was very definite concerning the stance *the bank* would take should it be made aware of the deception being practiced on it by Bazeghi, Kennevick, and Cobbs:

> I conclude, based on the testimony of William Cunningham and Richard Brown, that the Bank was never advised of the nature of the arrangement between the Cobbs/Kennevick partnership and Mark and Kathy Bazeghi and that, had the Bank been aware of the nature of the agreement, it would not have approved the long-term financing because the pre-leasing condition would not be met *by leases which the Bank was to treat as invalid.*

R. 1836 (emphasis added). The court continued on and made four very significant findings, which although not numbered, are readily discernible as such:

> The agreement between Mark Bazeghi and the Cobbs/Kennevick partnership was that Cobbs/Kennevick *would sign leases which appeared to be valid leases* so that the Bank would approve the financing because it would appear that the pre-leasing requirement had been made. Contemporaneously, Mark Bazeghi entered into hold-harmless agreements between himself and Cobbs/Kennevick to hold them harmless from any claims arising from the leases and to be liable for the rent if Cobbs/Kennevick did not occupy the premises or sublet them by July 1, 1981. Exh. 30, 31. The hold-harmless agreements were not attached to the leases, they were not provided to either the Bank or to the plaintiff, nor were either advised of their existence.... At no point did Cobbs/Kennevick ever testify that they believed that the hold-harm-

less agreements were entered into on behalf of Webster # 3 nor that they even knew of Webster 3.

> ....

> The leases were executed March 17, 1981. *Mr. Cobbs never discussed the Cobbs/Kennevick lease arrangements with Mr. Hudson.* Mr. Cobbs testified that he was aware that banks sometimes required leases to insure that there would be an adequate cash flow to meet the loan payments. *He also testified* that Mark Bazeghi did tell him *that the leases would be used to secure a buyer.*

> By a letter dated March 7, 1981, Mr. Hudson was advised by Mark Bazeghi that Lyle Cobbs and Jack Kennevick would lease space in the building. At that point, the space to be leased comprised 54% of the pre-leasing requirement. Mr. Bazeghi also told Mr. Hudson that Mr. Cobbs and Mr. Kennevick would lease space and that Mr. Cobbs would be active in helping lease the building.

R. 1836–38 (emphasis added).

Returning to special verdict questions 10, 11, and 12, *supra,* although the district court would post-trial concede that it had erred in giving such a theory to the jury, the fact remains that the jury in answering those three questions found that the defendants were negligent, which was the gist of the main theory Hudson sought to present against Cobbs and Kennevick. The jury also found in answering special verdict questions 15 and 16 that the negligent conduct of Cobbs and Kennevick was an extreme deviation from reasonable standards of conduct and was performed with an understanding or disregard of the likely consequences. R. 1516–17.

Under these circumstances, while it is readily perceived why the jury chose to assess no punitive damages against Cobbs and Kennevick, and in turn assessed $50,000 against Bazeghi, it is also readily perceived that the court erred in requiring the jury to *comparatively* assess the culpable negligence of Cobbs, Kennevick, and Bazeghi. Obviously the latter was the far more culpable, but this was *not* a situation lend-

ing itself to comparative negligence. The three named individuals all participated in a common scheme, *i.e.*, to produce two bogus leases, but "facially valid" as the district court so remarked, and those leases also played a part in causing Hudson to enter into the purchase of the office building. Presently I am not aware that such negligent conduct as was charged to Cobbs and Kennevick, combined with the fraudulent scheming conduct of Bazeghi by the court properly attributed to his principal, Webster # 3, can be anything but joint and several. If there is some Idaho case law precedent which apportions fault for participating in conspiracy of this sort, I should be pleased to have it brought forth.

The record is rife with error. Earlier it was suggested that the district court's error in refusing to instruct on plaintiff's requested theory of negligence was correctable. Here, where the district court instructed the jury as to multiple theories of liability, on two of which damages were awarded by the jury (rescission and negligent misrepresentation), and the jury's various answers to questions propounded by the court would have also been the same on simple negligence—the theory which the district court precluded the jury from utilizing, one remedy which this Court could consider would be to remand to the district court with directions to apply those answers to the proper theory which plaintiff alleged, and determine if doing so established the liability of the Cobbs/Kennevick partnership, and Bazeghi, Cobbs, and Kennevick, individually, and Webster # 3. If not, all the issues should be retried to another jury, or better still, this Court should give directions.

In conclusion, it would be remiss of me to not acknowledge the tremendous amount of time and effort expended by the district court in portraying the evidence which developed at trial. Only thereby gaining some understanding of the voluminous appeal record could I have delved deeper.

Both Justice Huntley and Justice McDevitt in authoring their respective opinions for the Court in this case would naturally turn to the district court's opinion. There they would learn, as I did, that the district court declared error in submitting to the jury the issue of negligent misrepresentation as a viable theory which would render the defendants Cobbs, Kennevick, Bazeghi, and the Cobbs/Kennevick partnership liable to the plaintiff, Wayne Hudson. Where there appeared in the district court's memorandum decision at R. 1860–61, the statement that defendants prior to trial had submitted and *then at the instructions conference* objected to instructing the jury on negligent misrepresentation, Justices Huntley and McDevitt would naturally take for granted that negligent misrepresentation was a theory of the case advanced by the plaintiff, and upon which the plaintiff had requested that the jury be instructed. Inadvertently, that forty-five page monumental opinion of the district court failed to intimate or suggest that the court had turned down the plaintiff's theory of simple negligence in favor of the theory which the court *sua sponte* advanced, that of negligent misrepresentation. Mr. Boyd's objection seemingly served no particular purpose whatever. It is not impossible that clerical mistake or inadvertence upon the part of the court was responsible for the district court's omission in not noting that both parties had objected. Only on examining the moving papers for the defendants' alternative motions was it discovered that plaintiff also objected, futilely, to instructing on the theory of negligent misrepresentation, and also resisted, futilely, the court's refusal to instruct as the plaintiff requested on his simple negligence theory. Attached hereto as Appendix F are plaintiff's requested instructions on the theory he preferred over negligent misrepresentation, and, indeed, a viable theory based on counsel's knowledge of the case.

With the district court's memorandum decision drafted as it was, and with 31 volumes of clerk's record and reporter's transcript, it is no wonder that both Justice Huntley and Justice McDevitt did not become aware that a negligent misrepresentation theory of defendant's liability was given to the jury solely on the court's determination to do so. As has been dis-

cussed, where the district court conceded it was error to instruct at all on negligent misrepresentation, there was absolutely no valid reason *to indulge* in the exercise of assuming that there was such a viable theory in Idaho, and then declaring, absent any reasons, reasoning, or *ratio decidendi* of any sort, that the plaintiff's evidence came up short in the proof, thus paving the way for the entry of judgment n.o.v. as to a theory which neither of the parties though proper.

Where the court committed error in giving the theory of negligent misrepresentation to the jury, that error belonged 100 percent to the court and the court alone. None of that error was attributable to Mr. Boyd's clients; none of that error was attributable to the clients of Mr. Eismann and Mr. Kennedy. Under those circumstances a court does not do anything else but confess its own error and set the case for retrial.

It is true that Mr. Boyd alternatively moved for judgment n.o.v., which under the rule of *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979), and *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986), requires the court to *reconsider*[12] whether the evidence, viewed most favorably to the part at whom the motion is aimed, is sufficient to sustain the verdict. Had the court concluded that the evidence was not sufficient, and assuming that the court had *not* committed the primary error of instructing on a theory not wanted, but objected to, by both parties, a judgment n.o.v. could have been a likely possibility.

Unfortunately, with the stage so set by the district court's failure to advise in its memorandum decision that giving of the negligent misrepresentation theory of liability was of its own doing, and at the same time mentioning in the abstract that the defendants had objected to so instructing the jury, Justice Huntley, and now in turn Justice McDevitt, were misdirected into believing that it was a plaintiff's theory, on which he would either stand or fall, and the district court had already ruled the evidence insufficient. The truth otherwise is now out, as is also the fact that the trial court did *not* instruct on the plaintiff's theory of negligence. All that remains to be seen is whether any member of the Court has profited by the illumination now shed on the trial court's unusual and wholly unprecedented conduct in: (1) instructing the jury on a theory of defendants' liability which both parties opposed; (2) conceding post-trial that it was error to instruct on negligent misrepresentation, but not granting a new trial;[13] (3) weighing the evidence produced at trial, *without any reference* that it was doing so under the guidelines of *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986), and *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979), and concluding that the evidence did not substantiate the jury's verdict in favor of plaintiff on a theory of negligent misrepresentation, which the court initially conceded had been erroneously given; but (4) without conceding or even suggesting that the theory was solely the product of only the mind of the court.

### III. ADDENDUM

Only after the above was written did I learn that the author of the Court's opinion, with the backing of his majority, intended to withdraw the court's 1989 opinion, No. 120, issued August 11, 1989.[14]

---

12. "*Re* consider," because the record demonstrates that the district court had already denied a motion for a directed verdict. Under those circumstances, with plaintiff presenting his simple negligence theory, and attempting to avoid the negligent misrepresentation theory advocated by the court, the court's denial of a directed verdict established that the case put on by plaintiff to prove *his* pleaded theory also satisfied the court's requirement on negligent misrepresentation, at least for the time being and until the court had a convenient change of mind when challenged post-trial by Mr. Boyd's motion.

13. It was defendants' motion which alleged the error, and defendants were absolutely entitled to a new trial because of the court's error. For that, and other errors mentioned herein, plaintiff also moved for a new trial. Instead, for reasons which have been alluded to, the court did not properly respond.

14. For some time it has been my view that the Court should not withdraw previous opinions, but, where a different result is reached on rehearing, simply so state with the expectation that the trial bench and bar will readily under-

That opinion was authored by Justice Huntley, joined by Justice Johnson and Justice McFadden, Pro Tem, and joined in part by Chief Justice Bakes, who also dissented in part. Almost every statement made by Chief Justice Bakes in his concurring and dissenting opinion was not only well thought out, but well stated, and also serves the purpose of fully supporting what I have written. Accordingly, because today's majority has withdrawn the 1989 Justice Huntley majority opinion and likewise the 1989 Chief Justice Bakes opinion which analyzed and criticized the Huntley opinion, both are, in pertinent part, attached hereto as Appendix G.[15]

Chief Justice Bakes first concurred in part in Justice Huntley's opinion: "I concur in that part of the Court's opinion which concludes that 'the trial court was correct in ruling that the elements for establishing negligent misrepresentations were not proved and, therefore, the jury verdict for plaintiff cannot stand and must be vacated.'" 1989 Slip Op. at 21. Thus we have Chief Justice Bakes agreeing with Justice Huntley, who in turn agreed with the trial court who had ruled "that the elements for establishing negligent misrepresentation were not proved and, therefore, the jury verdict [for plaintiff] cannot stand and must be vacated." *Id.* at 21. Justice Huntley had also noted earlier in his opinion at page 9, that: "The court ruled that it had erred in allowing the negligent misrep-

resentation claim to proceed to the jury." That the trial court did so admit and concede its own error is made abundantly clear in my opinion which precedes this addendum.

What Justice Huntley could not know, but what was discovered in many readings of the trial court's forty-five page memorandum decision, is that the trial court's error was far, far greater than envisioned. Nothing in that memorandum decision served to inform anyone that it was not the plaintiff who selected such a theory of defendants' liability, but it was the trial court *sua sponte* insisting on such a theory in preference to the plaintiff's pleaded theory of negligence in failing to disclose that the Cobbs/Kennewick leases were bogus. The court itself chose its own theory of defendants' liability. More than just that, Justice Huntley could not have known from the trial court's memorandum decision that the trial court had forced the jury to consider the theory of negligent misrepresentation *over* the objections of plaintiff Hudson and defendants Cobbs, Kennewick, and their partnership. Once the trial court was faced with attorney Boyd's alternate motions for judgment n.o.v., and/or a new trial, and after the trial court ruled that negligent misrepresentation was not a theory of remedy available in Idaho, it was indeed an exercise in futility to go through the motions of determining whether the proof was sufficient to sustain the verdict

stand whether a prior opinion for the Court stands or is superseded. One example is *Felton v. Finley*, 69 Idaho 381, 209 P.2d 899 (1949). There the first opinion for the Court issued on January 6, 1949, authored by Justice Givens and joined by Judges Featherstone and Taylor. Justice Holden and Judge Sutphen dissented. A rehearing was granted, and the case reargued in May 1949. A second opinion for the court issued shortly thereafter which was authored by Justice Holden, joined by Judge Featherstone, Judge Sutphen, and Justice Taylor (who had been elevated to the Supreme Court bench and took office on April 13, 1949). Without the nonsense of withdrawing the January opinion, the Court issued its second and final opinion consisting of three sentences:

A rehearing was had at Lewiston at our May, 1949, term. Since such rehearing the various contentions of the respective parties have been fully and carefully re-examined.

We conclude, as a result of such re-examination, that the decree appealed from in the case at bar should be, and it is hereby, reversed and the cause remanded with directions to dismiss the action, in accordance with the views expressed in the foregoing dissenting opinion of Chief Justice Holden.

Justice Givens, remaining constant to his earlier views, dissented.

15. Because Justice McDevitt's statement of the case is essentially a replay of Justice Huntley's, the facts set out in Justice Huntley's opinion are omitted as indicated in Appendix G. The interested reader can obtain a complete version of the opinions from the Idaho Capital Reporters. Justice Huntley omitted stating that the trial court also instructed the jury on plaintiff's rescission theory of defendants' liability. Likewise, Justice McDevitt makes the same omission. The jury returned a plaintiff's verdict on that theory.

for plaintiff Hudson on that theory. That theory should not have been presented. The court erred in doing so, and Chief Justice Bakes was not unjustified in saying of Justice Huntley's opinion that:

> Having thus concluded 'that the plaintiff did not present substantial competent evidence bringing this case within that doctrine ...,' the balance of the Court's discussion in the opinion regarding the elements of a cause of negligent misrepresentation under the Restatement (Second) of Torts, § 552, is unnecessary dicta, and will only tend to confuse the law of this state....

1989 Slip Op. at 21. What Chief Justice Bakes failed to observe, however, was that Justice Huntley was simply following the course mapped out by the trial court. It was the trial court who first beat the dead horse to death in the discussion of the application of the Restatement (Second) of Torts, § 552, *after* having ruled that there was error committed in allowing the jury to consider liability for negligent misrepresentation. Worse, however, neither the district court in the first instance, nor Justice Huntley in the second, pointed out any frailties in the plaintiff's proof.

Chief Justice Bakes' dissent is the backbone and substantiation for that which I had written before delving into his dissenting views. On page 22 of the 1989 Opinion No. 120, Chief Justice Bakes attacked Justice Huntley for stating a new trial was required for allowing the jury to ponder over a theory influenced by instructions given on a theory which is not legally sound and thereby "prevented Hudson from having a fair trial. *Ante* at 20." Chief Justice Bakes was as much in the dark as Justice Huntley relative to not knowing that neither plaintiff nor defendants wanted the case submitted to the jury with instructions on the theory of negligent misrepresentation, and, in fact, objected thereto. Nevertheless, he critically says of Justice Huntley's opinion that "the parties [each party] chose the theory upon which they tried the case, and ... 'are bound by the theory on which they try it' [citing two cases]." Chief Justice Bakes, in writing the foregoing, was not without jus-

tification. *He could not do otherwise but assume,* as did Justice Huntley, *that plaintiff Hudson had presented the theory of negligent misrepresentation.*

Justice McDevitt's opinion wholly ignores the Idaho case law precedent of *Kuhn v. Dell,* 89 Idaho 250, 404 P.2d 357 (1965) and *Everton v. Blair,* 99 Idaho 14, 576 P.2d 585 (1978). No authority is cited for the proposition that "the trial court's judgment n.o.v. was proper." The hypothesis, or rationale of the majority opinion is necessarily found somewhere in its final two paragraphs, comprising ten lines. There are but two possibilities. One is that judgment n.o.v. was proper because Hudson's proper cause of action was in contract, not tort. The other is even less persuasive, stating that "... although negligent misrepresentation ... *is* a viable cause of action in Idaho, the trial court's [entry] of judgment n.o.v. was proper." Neither of the two purported underpinnings can withstand scrutiny.

Betwixt and between the two it is stated that "[i]t could be argued that the negligent misrepresentation cause of action should never have been submitted to the jury." One should accept this as gospel, not argument. The district court itself pronounced that it was error to let the jury consider that theory of defendants' liability. Moreover, as may now be belatedly ascertained from the record and the transcript—to which reference has been painstakingly made by page, it will be found that it was so argued—by none other than Peter Boyd, Esq., to the district court. And, lo! the district court agreed, and conceded the error. At that point, Mr. Boyd's clients were entitled to a new trial. Likewise, Mr. Hudson was entitled to a new trial. Where the district court had gotten the bit between its teeth on a determination to instruct, and did instruct the jury *sua sponte* over the remonstrances of both parties on the theory of negligent misrepresentation, all of the parties involved were entitled to a new trial free of such error.

How can it be error to deny a directed verdict on an issue which the district court would concede should not have been given to the jury? The initial and primary error

was in concluding to give that theory to the jury over the objections of both the plaintiff and the defendants. Here, the fact which the majority will have to live with is that the court absolutely ruled that it erred in submitting the theory. As to the *ratio decidendi* of the other basis, *i.e.*, that judgment n.o.v. as to the negligent misrepresentation theory was *proper* because Hudson's proper cause of action was not in tort, but in contract is totally without substance. Unless, that sheer repetition makes it so—first said by the district court, and repeated by the majority. Factually stated, Hudson simply declined to ratify a fraudulent "straw" lease by suing on it.

One would necessarily be correct in assuming from the tenor of the majority opinion that anyone desiring to sell a parcel of real property at an inflated value could go to two or three reputable and economically sound acquaintances, obtain facially valid irrevocable 180 day offers to purchase for, say one at $750,000, one at $625,000, and the other at $1,000,000, with the persons signing those offers knowing that it was an accommodating thing to do for the owner of a property actually appraised at only $450,000. The three confederates would be assured in writing that the person, named above as "one," and all was done solely to produce a better price. It would be helpful to see how a distinction can be drawn between that set of facts and the facts in the instant case. In either scenario the confederates are grossly negligent in affixing their signatures to bogus paper, and are guilty of constructive fraud in not disclosing what they have done.

## APPENDIX A

Portions of the separate opinion of Bistline, J., in *Powell v. Nietmann*, 116 Idaho 590, 778 P.2d 340 (1989):

Where the transaction is an executory contract, breach of the contract may also give rise to the right of rescission. The district court in the same district where this action arose allowed rescission upon the sellers' unexplained four-year delay in furnishing the buyer with a policy of title insurance. *Blinzler v. Andrews*, 94 Idaho 215, 485 P.2d 957 (1971).

There is an Idaho case which is startlingly similar to the one before us. In *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966), this Court recognized 'the doctrine of implied warranty of fitness insofar as construction of a house was concerned. Major defects which render the house unfit for habitation, and which are not readily remediable, entitle the buyer to rescission and restitution.' 91 Idaho at 68, 415 P.2d at 111. Here, as has been noted, Powell's testimony was that without the property qualifying for a septic system of sewage disposal, the property was 'unbuildable.' It was on that basis that he was clearly entitled to rescission. Just as in *Bethlahmy* the evidence did not mount to the level of fraud, so here it falls even shorter. But in this case, as in that, there is a major defect, namely that the lot is not adaptable to a septic system; in this case as in that, the problem is not readily remediable; in this case as in that, there is a breach of the implied warranty of fitness, and, *ipso facto*, there was no basis for defending an action claiming the right to rescind.

*The Bethlahmy opinion* was unanimous. Authored by Justice Taylor it was also thorough and comprehensive. In addition to giving recognition to the doctrine of implied warranty, the opinion *also dwelt at some length on the duty to disclose*, which as has been pointed out herein, was not fulfilled when Nietmann listed the property with Reynolds and, as Judge Prather found, Nietmann told Reynolds nothing concerning the sewage problem. Justice Taylor wrote:

In the tentative draft of the Restatement of the Law Second, Torts, considered by The American Law Institute at its annual meeting in May, 1966, § 551(1) is presented as follows:

(1) *One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had*

represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

and (so far as applicable here) subsection (2):

(2) One party to a business transaction is under a duty to disclose to the other before the transaction is consummated

(a) Such matters known to him as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) Such additional matters known to him as he knows to be necessary to prevent his partial statement of the facts from being misleading; and * * *

(e) Facts basic to the transaction, if he knows that the other is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts.

*Bethlahmy*, 91 Idaho at 59, 415 P.2d at 702.

*Bethlahmy* has not only been often cited by this Court, but also by the courts in other jurisdictions. Justice Donaldson wrote the most recent Idaho opinion citing to and almost wholly relying on *Bethlahmy*. While in this case Nietmanns initially pleaded alternatively for rescission or damages, in the case referred to, *Tusch Enterprises v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987), the plaintiffs sought only the relief of damages on grounds which included, as here, misrepresentation, but also, as strangely omitted here, on other grounds which included implied warranty of habitability. *Tusch stated* that this Court did not believe that the misrepresentation claim should be analyzed only with reference to the usual elements, but then '*[i]t must*

also be considered whether the facts here fall within the category of cases finding a misrepresentation on the basis of nondisclosure' meaning silence as a form of misrepresentation.* 113 Idaho at 42, 742 P.2d 1027. This Court [in *Tusch*] also noted therein, in its discussion of Bethlahmy, at footnote 2, that the then tentative draft provision relied upon in Bethlahmy was adopted after only minor cosmetic changes. Those changes were indeed minor, and are not worth mentioning.*

. . . .

*Bethlahmy* and *Tusch* are strong medicine to cure ills suffered by buyers who have purchased real property with a defective building thereon, or the same ills suffered by buyers who have purchased real property which they find cannot even have a residence built upon.

. . . .

Although Justice Johnson correctly understands that active misrepresentation of material fact may serve as grounds for rescission, Idaho case law in addition thereto has accepted the proposition that 'The act of "representing" may take many forms.' *Sorenson v. Adams*, 98 Idaho 708, 715, 571 P.2d 769, 776 (1977). Nietmann in requesting Reynolds to sell Nietmann's lots was impliedly representing that the lots were marketable merchandise. While it is true that his testimony discloses a confused state of mind, it is clear enough that he had been cautioned by Bob Camp that he could not qualify his lots for a septic system. This important information should have been disclosed to Reynolds or any other broker to whom he happened to turn. '*Even silence, in circumstances where a prospective purchaser might be led to harmful conclusions, is a form of "representation."* ' *Sorenson*, 98 Idaho at 715, 571 P.2d at 776. '*In short, each party to a transaction must take care not to say or do anything tending to impose upon the other, and the mode of falsely representing a matter of fact is immaterial.*' 37 Am.Jur.2d 66, § 42 Manner of Making; Implied Representations. Those principles are equally appli-

cable here. Even accepting that Nietmann and Reynolds had no conversation whatever about sewage disposal, as Nietmann testified and the trial court found, *Nietmann's silence in not telling Reynolds of his problems with Panhandle Health, led to the exact 'harmful conclusions' which were observed in the Brooks [v. Jensen, 75 Idaho 201, 270 P.2d 425 (1954)] [case] as being a form of representation.*

*Powell v. Nietmann,* 116 Idaho 590, 604–606, 778 P.2d 340, 354–56 (1989) (Bistline, J. concurring and dissenting) (emphasis added and in original).

All of the cases above-cited are strong medicine to cure the ills suffered by office building buyers who find themselves misled. Three individuals acting in concert contrived to present facially valid lease agreements, the purpose of which initially was to deceive a bank. However, the purchaser was also being misled. Hudson, under the bank's mortgage on the office building, was required to make substantial monthly payments, but two of three of the tenants he acquired with his purchase are possessed of hold-harmless agreements, all of which means litigation will ensue, and may outlast Hudson's ability to make the mortgage payments out of his own funds, if he still has any. The litigation here is still under review, and may, and should be, returned to district court for a new trial.

## APPENDIX B

Pertinent portions of Hudson's third amended complaint, upon which the case went to trial:

I–1. Under the sales contract, Wildwood Office Center was to be completed and delivered by March 1, 1981, pre-leased to the extent of approximately 12,213 square feet.

I–2. As of March 1, 1981, the Wildwood Office Center was nearly complete but the pre-leasing requirements of the loan commitment had not been fulfilled.

I–3. Without the pre-leasing requirements having been met, the long term loan would not have been made by the Bank.

I–4. Without the long term loan the sale of the Wildwood Office Center to Plaintiff Hudson would not have been completed.

. . . .

I–6. Sometime before March 7, 1981, Defendant Mark Bazeghi explained to Defendant Cobbs and Defendant Kennevick that additional lease commitments were needed to meet the pre-leasing requirement for the long term loan and that the long term loan was essential for the completion of a pending sale of the Wildwood Office Center.

I–7. Defendant Mark Bazeghi stated to Defendant Cobbs and Defendant Kennevick that he was in desperate need of their help to meet the pre-leasing requirements.

I–8. Defendant Cobbs, Defendant Kennevick and Defendant Mark Bazeghi then undertook to devise and they did devise a scheme to defraud both the Bank and Plaintiff Hudson by means of artifice in the conduct of the affairs of Defendant Webster # 3, combining and conspiring so to do.

I–9. Plaintiff Hudson received the letter Exhibit H on or about March 7, 1981, listing Defendant Cobbs and Defendant Kennevick as having separately committed to lease separate suites aggregating 6,556 square feet of space at Wildwood Office Center.

I–10. Defendant Mark Bazeghi showed to Plaintiff Hudson a financial statement of Defendant Mark Bazeghi showing a personal net worth of approximately $1,400,000.00, and listing many properties in which he had an equity.

I–11. Defendant Mark Bazeghi stated to Plaintiff Hudson that all of Defendant Mark Bazeghi's real estate business had been promised to the Defendant Cobbs who was the owner of Idaho Properties, a real estate brokerage firm, and that Defendant Cobbs would open a branch sales office at Wildwood Office Center.

I–12. Defendant Mark Bazeghi stated to Plaintiff Hudson that Defendant Jack

Kennevick had the insurance business for all of Mark Bazeghi's investment partnerships, which Plaintiff Hudson theretofore had reason to believe.

I-13. Defendant Cobbs, subsequent to March 7, 1981, acknowledged to Plaintiff Hudson his commitment to lease space in the Wildwood Office Center and to act as agent in leasing space to others.

I-14. On March 17, 1981, Defendant Cobbs/Kennevick Partnership, both partners signing, executed a lease of Suite 101 of Wildwood Office Center.

I-15. Concurrently, on March 17, 1981, Defendant Cobbs and Defendant Kennevick and Defendant Mark Bazeghi signed a secret agreement (herein called Suite 101 hold harmless agreement) reciting that in consideration for the signing of the lease of Suite 101, Defendant Mark Bazeghi would hold Defendant Cobbs and Defendant Kennevick harmless 'from any claims arising out of his execution of said Lease Agreement....'

. . . .

I-17. On March 17, 1981, Defendant Cobbs/Kennevick Partnership, both partners signing, executed a lease of Suite 103 of Wildwood Office Center.

I-18. Concurrently, on March 17, 1981, Defendant Cobbs and Defendant Kennevick and Defendant Mark Bazeghi signed another and separate secret agreement (herein called Suite 103 hold harmless agreement) reciting that in consideration for the signing of the lease of Suite 103, Defendant Mark Bazeghi would hold Defendant Cobbs and Defendant Kennevick harmless 'from any claims arising out of his execution of said Lease Agreement....'

. . . .

I-22. Between June 9 and June 17, inclusive, Defendant Mark Bazeghi represented to Plaintiff Hudson that the lease commitments for Suite 101 and 103 were sound, long term obligations of two individuals of extensive financial net worth adding substantial security for Plaintiff Hudson in completing the purchase of the Wildwood Office Center.

I-23. By the deception aforesaid, Defendant Mark Bazeghi was enabled to and did procure Plaintiff Hudson's signature on the lease of Suite 101 and on the lease of Suite 103.

I-24. On or about June 17, 1981, Plaintiff Hudson, as Lessor, executed the lease agreement with Defendant Cobbs/Kennevick Partnership, as Lessee, providing for the lease of Suite 101 of Wildwood Office Center.

. . . .

I-28. In bringing about the leasing of Suite 101, Defendants Cobbs, Kennevick and Mark Bazeghi acted in concert.

. . . .

I-33. In bringing about the leasing of Suite 103, Defendants Cobbs, Kennevick and Mark Bazeghi acted in concert.

I-34. The signatures of Defendant Cobbs and of Defendant Kennevick on such lease agreements constituted separate representations by them that they intended to pay rent in accordance with the terms of such lease agreement.

I-35. Neither Defendant Cobbs nor Defendant Kennevick intended to perform or be bound by the lease of Suite 101 or the lease of Suite 103, it having been agreed among Defendants Cobbs, Kennevick and Mark Bazeghi that the express and implied representations contained in such lease agreements were false.

I-36. **None of the Defendants prior to nor on July 1, 1981, notified the Bank of Defendant Cobbs' and Defendant Kennevick's intention not to be bound by or to perform the leases of Suite 101 and Suite 103.**

I-37. **None of the Defendants notified Plaintiff Hudson of the Defendant Cobbs and Defendant Kennevick intention not to be bound by or to perform the leases of Suite 101 and Suite 103.**

I-38. **Plaintiff Hudson did not know that Defendants Cobbs and Defendant Kennevick intended not to be bound by**

**and not to perform the leases of Suite 101 and Suite 103.**

R. 790–802 (emphasis added).

R–9. When the Defendant Cobbs and the Defendant Kennevick signed and delivered the subject leases to the Defendant Mark Bazeghi, they knew, or in the exercise of ordinary care should have known, that the Defendant Mark Bazeghi intended to represent to Plaintiff Hudson or some other prospective buyer of the Wildwood Office Center that such leases were valid and enforceable leases with the purpose of inducing Plaintiff Hudson or some other prospective buyer of the Wildwood Office Center to complete the purchase or to purchase the Wildwood Office Center.

. . . .

R–12. While the Defendant Cobbs and the Defendant Kennevick knew, or in the exercise of reasonable care should have known, of the desperate financial situation of the Defendant Mark Bazeghi and the Defendant Webster No. 3, in meeting the preleasing requirements of the contract of purchase, the Defendant Cobbs and the Defendant Kennevick signed and delivered the subject leases to the Defendant Mark Bazeghi in wanton disregard of what the Defendant Mark Bazeghi would do in terms of changing dates, signing initials and signatures, before presenting such leases to the Bank or to the Plaintiff Hudson or to others.

R–13. The Defendant Cobbs and the Defendant Kennevick negligently signed and negligently delivered the subject leases to the Defendant Mark Bazeghi in wanton disregard as to how or in what manner the Defendant Mark Bazeghi would use or present such leases to the Bank or to the Plaintiff Hudson or to others.

. . . .

R–16. When the Plaintiff Hudson reviewed the subject leases as presented to the Plaintiff Hudson by the Defendant Mark Bazeghi, the Plaintiff Hudson would not have signed the subject leases and completed the purchase of the Wildwood Office Center from Defendant Webster No. 3 had the Plaintiff Hudson known that Defendant Cobbs and Defendant Kennevick did not intend to be bound by the subject leases.

R. 826–27.

## APPENDIX C

Pertinent portions from the trial court reporter's transcript of the instructions conference are as follows:

[MR. EISMANN:] We have moved to Instruction No. 40, and in this instruction, as we view it, the instruction obviously relates to negligent misrepresentation. *The Plaintiff's requested Instruction Number 58 is simply a statement of negligence.*

We think we are entitled to an instruction on negligence, and that a person who places in circulation a blank or incomplete document or even a completed document has some responsibility and duty to see that it doesn't wreak havoc with those people who come across that document.

THE COURT: Okay, well, I will give you my reasoning for my decision on that now so that later if I am—well, this is how I see it. I read all the negligence cases, *and my Clerk checked through this issue substantially.*

When the sole loss is pecuniary loss, there's no case that has found a duty owed in those circumstances except where it falls within negligent misrepresentation.

The generalized duty to avoid doing what might harm another exists with respect in all cases that you cited and in every case that we could find with respect to physical or property damage. The gist of what you are saying is they made a negligent misrepresentation.

Rather than dismiss the negligence count entirely, I view it as negligent misrepresentation, which is they negligently made a misrepresentation. That is, negligently placed these leases in action [sic, circulation], and I think that negligent misrepresentation more truly and accu-

rately states the true nature of the cause of action.

There's no case that—that I have found that would impose a duty, the generalized duty that you have urged with respect to a negligence count and therefore, I have ruled that it can only proceed by way of negligent misrepresentation. It may not proceed by way of mere negligence.

It simply doesn't apply based on all the cases that we researched where the sole damage is pecuniary loss, so that is my ruling on that.

I realize your position, and we have checked it, and we have looked at your cases, and they were all personal injury and property damage cases.

MR. EISMANN: You could be a pioneer, Your Honor.

THE COURT: Oh, [I] think we are doing enough of that in this case already.

Tr. 3229–31 (emphasis added).

### APPENDIX D

Pertinent portions of applicable law selected from *Tusch Enterprises v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987), are as follows:

We addressed the instances where nondisclosure may amount to misrepresentation in *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966). In *Bethlahmy*, the defendant, Bechtel, was the builder and vendor of a residential home. Bechtel told the plaintiffs that the houses he built were the finest, and that the house at issue was of first quality construction. However, Bechtel did not disclose to the plaintiffs that a tiled water line ran underneath the garage and to within seven or nine feet of the north wall of the residence. We explained plaintiffs' cause of action:

Plaintiffs commenced this action for rescission and restitution, mainly on the ground of defendants' failure to disclose the defective condition of the house. The presence of the unsealed irrigation ditch through the lot and beneath the garage, coupled with the fact that the basement was not of waterproof construction, constituted major defects, known to defendants, and unknown to plaintiffs, and not discoverable upon reasonable inspection. Failure to disclose such defects would support a finding of fraud. *Id.*, at 59, 415 P.2d at 702.

Relying upon § 551 of a tentative draft of the Restatement (Second) of Torts, the court found that the plaintiffs had presented facts entitling them to relief:

Defendant did not testify that he called attention to, or advised plaintiffs of, the ditch running under the lot and garage; nor that the ditch was constructed of drainage tile without sealed joints; nor that the basement was not of waterproof construction. These facts were known to defendant and unknown to plaintiffs. They were not discoverable by inspection. Defendant had superior knowledge. Plaintiffs were ignorant of the facts. The parties did not deal at arms length. Defendant dealt from a position of superior knowledge. A confidential relationship arise between the parties. *Stearns v. Williams*, 72 Idaho 276, 288, 240 P.2d 833 (1952). Plaintiffs relied, and were entitled to rely, upon defendant's representation that the house would be a quality home. The facts essential to a finding of constructive fraud ... are not in dispute. *Id.*, 91 Idaho at 62, 415 P.2d at 705.

The rationale for recognizing such a cause of action was explained in *Bethlahmy* with the following quotation from *Kaze v. Compton*, 283 S.W.2d 204, 207 (Ky.1955):

It cannot be controverted that actionable fraud or misrepresentation by a vendor may be by concealment or failure to disclose a hidden condition or a material fact, where under the circumstances there was an obligation to disclose it during the transaction. *If deception is accomplished, the form of the deceit is immaterial.* And *the legal question is not affected by the absence of an intent to deceive,* for the element of intent, whether good or

bad, is only important as it may affect the moral character of the representation. *Bethlahmy, supra,* 91 Idaho at 60, 415 P.2d at 703.

*Kaze v. Compton* explained that actual intent to deceive need not be shown where the seller knew of facts which would have apprised a person of ordinary prudence of the truth: if a reasonable person would have been so apprised, and the seller was under a duty to inform the buyer of the concealed facts, then intent to deceive is not necessary to make a prima facie showing. *Kaze, supra,* at 208.

*Tusch Enterprises v. Coffin,* 113 Idaho at 42–43, 740 P.2d at 1027–28 (emphasis added).[16]

## APPENDIX E

### GENERAL STATEMENT OF THE LAW

**Actual or constructive fraud.** Fraud is either *actual or constructive.* Actual fraud consists in deceit, artifice, trick, design, some direct and active operation of the mind; it includes cases of the intentional and successful employment of any cunning, deception, or artifice used to circumvent or cheat another. It is something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception. Constructive fraud consists in any act of commission or omission contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another. Or, as otherwise defined, it is an act, statement or omission which operates as a virtual fraud on an individual, or which, if generally permitted, would be prejudicial to the public welfare, and yet may have been unconnected with any selfish or evil design. Or, **constructive frauds** *are such acts or contracts* as, though not originating in any actual evil design or contrivance to perpetrate a positive fraud or injury upon other persons, *are yet, by their tendency to deceive or mislead other persons,* or to violate private or public confidence, or to impair or injure the public interests, *deemed equally reprehensible with actual fraud.* Constructive fraud consists in any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or, in any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

**Extrinsic fraud.** Fraud which is collateral to the issues tried in the case where the judgment is rendered. Type of deceit which may form basis for setting aside a judgment as for example a divorce granted ex parte because the plaintiff-spouse falsely tells the court he or she is ignorant of the whereabouts of the defendant-spouse.

. . . .

**Fraud in the inducement.** Fraud connected with underlying transaction and not with the nature of the contract or document signed.

Black's Law Dictionary 595 (5th ed. 1979) (citations omitted) (emphasis added).

---

**16.** The *Stearns* case mentioned in this Court's *Bethlahmy* opinion is deserving of some elaboration. It is a landmark case in Idaho jurisprudence, and has been often cited and followed in Idaho, and other jurisdictions as well. That case was first decided by an able district judge, the Hon. Preston Thatcher, and affirmed in a unanimous opinion authored by Justice Darwin Thomas. Eminent counsel represented the parties. The case undoubtedly made new law in Idaho, and it is still the law.

Although it is not often, if ever, so heralded, it is very likely the first case in Idaho imposing the obligation of good faith, considering which doctrine there has been considerable discussion and controversy of recent years. The statement as it appears in *Stearns* is that:

A fiduciary relationship does not depend upon some technical relation created by or defined in law, but it exists in cases where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence.

*Stearns v. Williams,* 72 Idaho 276, 288, 240 P.2d 833, 840–41 (1952) (citations omitted).

498

From *Rawson v. United Steelworkers of America*, 111 Idaho 630, 726 P.2d 742 (1986):

> The trial court also granted the Union's motion for summary judgment of dismissal on the Miners' negligence claim. The court concluded that the Miners had not established that the Union owed a duty to the deceased miners. The trial court's memorandum opinion in support of its order granting the motion for summary judgment on the negligence claims reads:
>
> > Plaintiffs seek to hold the Union responsible on negligence theories. A fundamental component of a negligence claim is the existence of a duty toward another. *Hoffman v. Simplot Aviation, Inc.*, 97 Idaho 32, 539 P.2d 584 (1975). A duty is a standard of conduct to which the defendant is required to conform. *Algeria v. Payonk*, 101 Idaho 617, 619 P.2d 135 (1980). Plaintiffs rely on the collective bargaining agreement and RESTATEMENT (SECOND) OF TORTS, §§ 323 and 324A (1965), as the sources for the legal duty owed by defendant Steelworkers.
> >
> > A breach of contract is not in and of itself a tort. A contract, may, however, create a situation which furnishes the occasion for a tort. When a person renders services to another pursuant to a contract or otherwise, the law imposes a duty of care in the performance of those services. 'The duty of care arises ... irrespective of contract.' ... *Taylor v. Herbold*, 94 Idaho 133, 484, [483] P.2d 664 (1971). Mere failure to carry out contractual obligations cannot support a tort action while misfeasance in the performance of contract obligations may support a tort action.

*Rawson*, 111 Idaho at 632–33, 726 P.2d at 744–45. In an action to prove actual fraud, the claimant must prove that the other party had an *intent* to deceive. In a case of constructive fraud, that element is not required. *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966). Consider this discussion in *Sorenson v. Adams*, 98 Idaho 708, 571 P.2d 769 (1977):

> The act of 'representing' may take many forms:
>
> > While false representations generally consist of verbal or written statements, a misrepresentation in words is not essential.... [A] misrepresentation need not be express, but may be implied or inferred from circumstances which are in fact equivalent to positive representation, or from acts or conduct, *such as the exhibiting of fraudulent or misleading documents*, or maps or plats.... (Emphasis supplied.) 37 Am.Jur.2d *Fraud* § 42 (168). *Brooks v. Jensen*, 75 Idaho 201, 215–216, 270 P.2d 425 (1954).
>
> Even silence, in circumstances where a prospective purchaser might be led to harmful conclusions, is a form of 'representation.'

*Sorenson*, 98 Idaho at 715, 571 P.2d at 776. Additionally:

> The allegations set forth in respondent's cross-complaint are sufficient to state a cause of action against appellant for constructive fraud. The distinction between actual fraud and constructive fraud is stated in 37 C.J.S. Fraud § 2, p. 211, as follows:
>
> > Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.

*McGhee v. McGhee*, 82 Idaho 367, 371, 353 P.2d 760, 762 (1960) (citations omitted).

## APPENDIX F

PLAINTIFF'S REQUESTED *Jury Instructions*

JURY INSTRUCTION NO. 1

In brief summary, Plaintiff claims as follows:

In 1980 he contracted to purchase an office building that was under construction. The purchase was subject to the delivery by seller to plaintiff of a long term loan. The Idaho First National Bank had committed to the long term loan but only if approximately eighty-four percent (84%) of the building was preleased.

It was Webster Investments #3's obligation to prelease, which it ultimately did by submitting two fictitious leases, each signed by Defendants Lyle R. Cobbs and Jack Kennevick, and by one lease to a sham corporation known to Defendants Cobbs, Kennevick and Mark Bazeghi to be without substance. Neither Mr. Cobbs nor Mr. Kennevick intended to be bound by the leases signed by them. It was, however, intended by them that the Bank would rely on such leases and fund the long term loan and that Plaintiff would also rely and accept the building and responsibility for the loan.

In an agreement of June 24, 1981, which is part of the sales contract, it was represented that the preleasing requirement had been met. Relying on the representation, the leases, and other representations, Plaintiff did accept the seller's performance and responsibility for the loan. The Bank's approval of the leasing arrangement was also an element of Plaintiff's reliance.

The agreement of June 24, 1981, also committed the seller to a quaranty of leases covering more than 65% of the space in the building. The seller failed to live up to this guarantee.

The leases above mentioned and other representations were false as were known to the makers. Defendants Mark Bazeghi, Jack

**500**

Kennevick and Lyle R. Cobbs acted together in the foregoing which constituted a conspiracy to defraud and an actual fraud on the Plaintiff. Each conspirator is liable for the acts of any other.

The seller of the building was Webster Investments #3, which is a general partnership. As such, each partner is liable for the acts of its managing partner, who is Mark Bazeghi.

Plaintiff seeks compensatory damages by each of several alternative claims. You will be making a determination on each separate claim but, of course, the Plaintiff may collect only once. The different causes of action are:

1. Breach of contract:

(a) Because of the fictitious leases Webster Investments #3 failed to meet its obligation to prelease.

(b) Webster Investments #3 failed to pay rent under the guaranty.

2. Fraud:

(a) Webster Investments #3 is responsible for the fraud of its managing partner, Mark Bazeghi and his co-conspirators.

3. Fraud -- Conspiracy:

(a) Jack Kennevick, Lyle R. Cobbs and Mark Bazeghi acted in concert in a scheme to defraud and they did defraud the Plaintiff.

4. Violation of the Idaho Racketeering Act.

(a) Plaintiff has sustained injury by a pattern of racketeering activity as defined in the law.

5. Negligence:

(a) In signing incomplete leases and delivering them to

Mark Bazeghi, there was negligence on the part of Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick Partnership.

(b) In failing to disclose to Plaintiff and the Idaho First National Bank that Lyle R. Cobbs and Jack Kennevick and the Cobbs/Kennevick Partnership did not intend to be bound by the leases, there was negligence on the part of Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick Partnership.

(c) In failing to tell Plaintiff and Idaho First National Bank of the lack of substance of the corporate lessor mentioned, there was negligence on the part of Lyle R. Cobbs.

(d) The negligence was gross.

---

BISTLINE, J. comments.

Every sentence in the first six paragraphs of the plaintiff's requested Instruction No. 1 will be found almost identically stated in the district court's post-trial memorandum decision. Moreover, it is not seen that setting forth theories and contended facts is argumentative.

---

GIVEN

REFUSED _____ X

MODIFIED _____

COVERED _____ X That part which was not argumentative

OTHER _____ was covered.

**502**

PLAINTIFF'S REQUESTED

JURY INSTRUCTION NO. 57

The plaintiff also claims that defendants Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick Partnership were negligent in signing the incomplete leases covering Suites 101 and 103 of the Wildwood Office Center and delivering the same to defendant Mark Bazeghi, knowing that Mark Bazeghi intended to present such leases to Idaho First National Bank and plaintiff when they knew, or should have known, that said Bank and plaintiff would rely on said leases, that they were negligent in failing to notify Idaho First National Bank and plaintiff of their intention not to be bound by said leases, and that defendant Lyle R. Cobbs was negligent in the manner by which he failed to notify plaintiff and Idaho First National Bank of essential information in connection with the leasing of Suite 202 to The Professionals, Inc. Plaintiff also claims that such conduct on the part of defendants Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick Partnership was in wanton disregard of the rights of Idaho First National Bank and plaintiff and constituted gross negligence. Plaintiff alleges that he was damaged as a proximate result of such negligence on the part of said defendants.

| | |
|---|---|
| GIVEN | X |
| REFUSED | |
| MODIFIED | |
| COVERED | |
| OTHER | |

BISTLINE, J. Comment:

That the court initially (after submission to the court before trial) marked this instruction /X/ Given, yet did not give it, is in accord with the court's later statement at the instructions conference that the court and the court's law clerk were indeed researching the law with the thought in mind to instruct on negligent misrepresentation instead of plaintiff's theory of negligence nondisclosure.

PLAINTIFF'S REQUESTED

JURY INSTRUCTION NO. 58

For the Plaintiff Hudson to establish that the Defendants Lyle R. Cobbs, Jack Kennevick or the Cobbs/Kennevick Partnership was negligent, the Plaintiff Hudson has the burden of proving each of the following propositions by a preponderance of the evidence:

1. That the defendants Lyle R. Cobbs, Jack Kennevick, and/or the Cobbs/Kennevick Partnership were negligent in connection with their participation, conduct or omissions in·the leasing of office space in the Wildwood Office Center.

2. That the plaintiff Hudson was damaged.

3. That the negligence of the defendants Lyle R. Cobbs, Jack Kennevick and/or the Cobbs/Kennevick Partnership was a proximate cause of plaintiff Hudson's damages.

4. The nature and extent of plaintiff's damages, the elements of damage, and the amount thereof.

If you find from your consideration of all the evidence that each of the propositions has been proved by a preponderance of the evidence, then your verdict should be for the plaintiff; but, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendant.

IDJI 270-1, as modified

| GIVEN | ✗ |
|---|---|
| REFUSED | |
| MODIFIED | |
| COVERED | |
| OTHER | |

BISTLINE, J. Comment:

See comment to Instruction No. 57.

**504**

PLAINTIFF'S REQUESTED

JURY INSTRUCTION NO. 59

When I use the word "negligence" in these instructions, I mean the failure to use ordinary care in the management of one's person. The words "ordinary care" mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence. Negligence may thus consist of the failure to do something which a reasonably careful person would do, or the doing of something a reasonably careful person would not do, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide.

IDJI 210
As Modified

BISTLINE, J. comment:

See comment to requested Instructions No. 57, 58.

GIVEN X

REFUSED _____

MODIFIED _____

COVERED _____

OTHER _____

PLAINTIFF'S REQUESTED

JURY INSTRUCTION NO. 60

The amount of caution required of a person in the exercise of ordinary care depends upon the conditions apparent to him or that should be apparent to a reasonably prudent person under circumstances similar to those shown by the evidence.

California Jury Instructions,
Sixth Edition, No. 3.12

BISTLINE, J. comment:

The instruction is sound. Presently
I have not found that its content
was covered elsewhere.

GIVEN _____

REFUSED _____

MODIFIED _____

COVERED ___✝_____

OTHER _____

506

PLAINTIFF'S REQUESTED

JURY INSTRUCTION NO. 61

One owes a duty to every person in our society to use reasonable care to avoid damage to the other person in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in damage. In determining whether such duty has been breached by the allegedly negligent party, his conduct is measured against that of an ordinarily prudent person acting under all the circumstances and conditions then existing.

85 ICAR 1285, Sept. 18, 1985 at p. 1289;
Alegria v. Payonk, 101 Id. 617, 619
P.2d 135 (1980); Nogel v. Hammond,
90 Id. 96, 408 P.2d 468 (1965).

BISTLINE, J. comment:

The instruction is sound. The district court's comment is not understood. All damages, even pain and suffering, are assessed a pecuniary (monetary) award.

GIVEN _____

REFUSED X ~~that~~ each case applies only to person

MODIFIED _____ or property not pecuniary loss

COVERED _____

OTHER _____ DABrian

PLAINTIFF'S REQUESTED

JURY INSTRUCTION NO. 62

The law does not require that defendants Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick partnership must have been able to foresee the precise damage which in fact resulted from the alleged negligence, or the particular injurious result which might be inflicted upon a person as the result thereof by reason of his negligence. The law only requires that defendants Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick partnership should be able to understand and appreciate that results of some kind injurious in nature may be reasonably anticipated from the negligent act of omission or commission.

<u>Burkland v. Oregon Shortline R.R.</u>
<u>Co.</u>, 56 Idaho 703, 713 - 714

| BISTLINE, J. comment: |
|---|
| There appears to be no conceivable reason for not giving this instruction, other than that the district court would ultimately refuse to instruct on plaintiff's theory of negligence and failure to disclose. |

GIVEN

REFUSED

MODIFIED

COVERED

OTHER

508

PLAINTIFF'S REQUESTED

JURY INSTRUCTION NO. 63

One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. If the answer to that question is "yes," and if the action or inaction could have been avoided, then not to avoid it would be negligence.

> California Jury Instructions,
> Sixth Edition, No. 3.11

> BISTLINE, J. comment:
>
> This instruction is proper, but apparently refused for the same reason as requested Instruction No. 62.

GIVEN _____

REFUSED _____

MODIFIED _____

COVERED _____

OTHER _____

## APPENDIX G

HUNTLEY, J.

This case presents the issue of whether, when a jury renders a verdict granting relief on one of two alternative theories of law submitted to it by the court, a new trial should be granted when the trial court determines on post-trial motions, that the theory should not have been presented to the jury. We answer the question in the affirmative and reverse and remand for a new trial.

### FACTS

This case revolves around a series of agreements between: (1) Mark Bazeghi (the managing general partner acting on behalf of the Webster # 3 General Part-

nership); (2) the Idaho First National Bank; (3) Plaintiff Wayne D. Hudson; and (4) Defendants Cobbs, Kennevick, and the Cobbs/Kennevick partnership.

The Webster # 3 Partnership owned a tract of land in Boise called the Wildwood Center. This tract of land included the Wildwood apartments and the Wildwood office buildings. On August 1, 1980, Webster # 3 obtained a $580,000 loan from Idaho First to finance construction of the office buildings on the Wildwood property. Interest was set at 13% payable on July 1, 1981. Under the terms of the loan agreement, the loan was convertible to long-term financing *if* the office building was pre-leased to the extent of 12,210 feet prior to July 1, 1981.

. . . .

Although the trial court had denied a motion for a directed verdict it granted the defendants' motion for judgment notwithstanding the verdict approximately seven months after entering judgment against the defendants on the jury verdict. The court ruled that negligent misrepresentation was not at present a viable cause of action in Idaho, no appellate decision having recognized the tort. It further ruled that even if such a tort were recognized in Idaho, the evidence did not support a finding for Hudson on all the requisite elements of that tort. The court ruled that it had erred in allowing the negligent misrepresentation claim to proceed to the jury. Thereafter, the court denied Hudson's motion for a new trial, and his motion to amend the j.n.o.v. It is the court's j.n.o.v. ruling and refusal to grant new trial which gives rise to Hudson's appeal herein.

## I.

We first consider whether the trial court erred in its post-trial ruling that the cause of action in negligent misrepresentation should not have been submitted to the jury. We hold as a matter of law that the plaintiff did not present substantial competent evidence bringing this case within that doctrine and, therefore, affirm on this issue.

1989 Slip Op. 3–10. [At this point Justice Huntley set out the provisions of Restatement (Second) of Torts, § 552, after stating: "The appellate courts in every state in the Ninth Circuit area where the issue has been presented, have recognized the tort of negligent misrepresentation as elucidated in the Restatement, those states being: Washington, Alaska, New Mexico, Montana, Arizona, Utah, Wyoming, Nevada, Colorado, and Hawaii. Only Kansas, Oklahoma, Oregon, and Idaho have yet to speak to the issue." 1989 Slip Op. at 10–11. Justice Huntley stated the holdings of these states over the ensuing pages of 11–16 of his opinion. His opinion continues]:

## II.

In addition to citing the absence of Idaho case law on negligent misrepresentation, the trial court stated two other reasons for granting the motion for j.n. o.v. First, that Hudson's action was properly in contract not tort and secondly, that the requisite elements of negligent misrepresentation were not fulfilled. Regarding the first reason, the court wrote:

> The threshold issue before the court is whether Idaho would allow this claim to proceed in tort as a negligent misrepresentation claim rather than as a breach of contract claim. Generally, where a duty to perform arises from a contract, the cause of action lies in contract, not tort, when the duty is breached. As the Idaho Supreme Court noted in *Carroll v. United Steelworkers of America*, 107 Idaho 717, 692 P.2d 361 (1984), it is well settled that "an alleged failure to perform a contractual obligation is not actionable in tort . . . found an action in tort, there must be a breach of duty apart from nonperformance of a contract" (quoting *Taylor v. Herbold*, 94 Idaho 133, 483 P.2d 664 (1971)) mere nonfeasance, even if it amounts to willful neglect to perform the contract is insufficient to establish a duty in tort. 107 Idaho at 719 [692 P.2d at 363].

See also, *Steiner Corp. v. American District Tele.*, 106 Idaho 787, 683 P.2d 435 (1984).

The relationship created between the plaintiff and the defendants Cobbs and Kennevick by the lease agreement was a landlord/tenant relationship. The lease agreements created an obligation to pay rents which was breached. No other relationship existed between the plaintiff and the defendants at the time the lease agreements were entered. . . . No positive duty outside the contract and imposed by law exists. A positive breach of duty imposed by law or negligence in performing a contractual act is necessary for liability in tort to exist. *Taylor v. Herbold, supra.* Lyle Cobbs and Jack Kennevick breached their obligations to pay rent under the two leases. No agreement was proven which would relieve them of the obligation to pay rent to the plaintiff Hudson even though the agreement entered into between them and Mark Bazeghi would entitle them to be reimbursed by him. Their position that they would not be obligated on the leases because they were either blank when signed or they did not notice Mr. Hudson's name would not relieve them of their contractual obligation. Certainly, the position was unreasonable and caused the plaintiff additional costs. The remedy for their unreasonable refusal to perform a binding agreement is to award fees against them reflecting the plaintiff's full cost in obtaining the promise performance of the leases. However, their unreasonable refusal to perform a contractual obligation would not give rise to a right of action in tort.

As is evident in the foregoing passage, the trial court erred when it ruled 'No positive duty outside the contract and imposed by law exists.' It is true that Cobbs and Kennevick had a contractual obligation and failed to fulfill it and they could have been sued for breach of contract. However, such is a matter separate and apart from the issue of whether Cobbs and Kennevick may be held liable for their written misrepresentations which induced Hudson to finalize the contract with Webster # 3. As the cases cited in Part I demonstrate, the 'negligent misrepresentation' which gives rise to the cause of action is frequently found in contract documents.

III.

In ruling that the necessary elements for negligent misrepresentation were not proved, the trial court stated:

Furthermore, the tort of negligent misrepresentation requires the existence of certain elements not present in the instant case. The "false information" must be supplied in the course of the maker's business, profession or employment or in "any other transaction in which he has a pecuniary interest." Restatement (Second) of Torts § 552. Neither Lyle Cobbs nor Jack Kennevick made the leases in the course of business, profession or employment of either of them or the partnership. While Mr. Hudson alleged that there was a pecuniary interest in the transaction, none existed at the time of the leases. Thus, even assuming that the leases were "false information," the proof did not establish the type of relationship which justifies the imposition of the duty not to make a negligent misrepresentation. This case presents the anomaly that, while Jack Kennevick and Lyle Cobbs thought they were entering into non-binding agreements they actually were entering into binding agreements upon which they were liable. However, because the proof never established any pecuniary interest, the tort of negligent misrepresentation does not lie even if the other elements are assumed to be present. The plaintiff speculated that there would be pecuniary interest based on Mark Bazeghi's statements to him that Cobbs and Kennevick would receive additional business from him, but the proof never sustained the plaintiff's speculations.

Our review of the record establishes the trial court was correct in ruling that the elements for establishing negligent misrepresentation were not proved and, therefore, the jury verdict for plaintiff cannot stand and must be vacated. However, the grant of judgment n.o.v. to defendant was improper, the appropriate remedy being to grant a new trial under the authorities discussed in Part IV, *post.*

## IV.

The next issue presented is whether the court erred in refusing to order a new trial.

Idaho Rule of Civil Procedure 59(a) provides in pertinent part:

**Rule 59(a). New trial—Amendment of judgment—Grounds.—A** new trial may be granted to all or any of the parties and on all or part of the issues in an action for any of the following reasons: 1. *Irregularity in the proceedings of the court,* jury or adverse party or any order of the court *or abuse of discretion* by which either party was prevented from having a fair trial.

. . . .

7. *Error in law, occurring at the trial.* Any motion for a new trial based upon any of the grounds set forth in subdivisions 1, 2, 3, or 4 must be accompanied by an affidavit stating in detail the facts relied upon in support of such motion for a new trial. Any motion based on subdivisions 6 or 7 must set forth the factual grounds therefor with particularity. [Amended March 20, 1985, effective July 1, 1985.] (Emphasis supplied.)

\* \* \* \* \* \*

In the instant case, the trial court instructed the jury that it could find the defendants liable or innocent on either one of two tort theories; fraud or negligent misrepresentation. After extended deliberation, the jury returned a verdict wherein it found Cobbs and Kennevick innocent of fraud but liable for negligent misrepresentation. Seven months later, the trial court granted defendant's motion for judgment n.o.v. on the grounds that the tort of negligent misrepresentation had not yet been recognized in the state of Idaho, and that even if it were recognized, the facts herein would not establish a case of negligent misrepresentation, and that it therefore erred in instructing the jury.

The tendering to the jury of an inapplicable legal theory was certainly an irregularity in the proceedings, and an abuse of discretion which prevented Hudson from having a fair trial. The incorrect instruction was also a significant error in law occurring at the trial court level.

Idaho has a long line of cases holding that where a jury is instructed on theories of law for which there is no substantial evidence to support the theory, that such constitutes reversible error. For example, in *Kuhn v. Dell,* 89 Idaho 250, 404 P.2d 357 (1965) this Court held:

It is reversible error to instruct the jury on the doctrine of last clear chance where there is no substantial evidence to support the doctrine. *Graham v. Milsap, supra* [77 Idaho 179, 290 P.2d 744 (1955)]; *Cournyer v. Follett,* 85 Idaho 119, 376 P.2d 707 (1962); *Hale v. Gunter,* 82 Idaho 534, 356 P.2d 223 (1960); *Ralph v. Union Pacific Railroad Company,* 82 Idaho 240, 351 P.2d 464 (1960); *Laidlaw v. Barker,* 78 Idaho 67, 297 P.2d 287 (1956).

In *Everton v. Blair,* 99 Idaho 14, 576 P.2d 585 (1978) this court held:

The trial court is under a duty to instruct the jury on every reasonable theory recognized by law that is supported by trial. *Hodge v. Borden,* 91 Idaho 125, 417 P.2d 75 (1966); *Domingo v. Phillips,* 87 Idaho 55, 390 P.2d 297 (1964); *Wurm v. Pulice,* 82 Idaho 359, 353 P.2d 1071 (1960). However, instructions should not be given which are not based on evidence from the trial. *Bratton v. Slininger,* 93 Idaho 248, 460 P.2d 383 (1969); *Fawcett v. Irby,* 92 Idaho 48, 436 P.2d 714 (1968). Instructions should not be given on a theory which is not legally sound. *Co-*

rey v. Wilson, 93 Idaho 54, 454 P.2d 951 (1969); Cassia Creek Reservoir Co. v. Harper, supra [91 Idaho 488, 426 P.2d 209 (1967)]

An instruction which incorrectly states the law provides grounds for ordering a new trial. Corey v. Wilson, supra; Walker v. Distler, 78 Idaho 38, 296 P.2d 452 (1956); I.R.C.P. 59(a)(7).

The submission of the incorrect alternative theory is of some substantial moment on the facts of this case. One may analogize to the negligent misrepresentation being a sort of 'lesser included tort' of fraud. Fraud required clear and convincing proof while negligent misrepresentation required only a preponderance of the evidence. That the jury decided the case on the alternative requiring the lesser degree of proof leaves open the question of what nine jurors might have done had they been faced with a choice of all or nothing on the fraud cause.

Accordingly, we reverse and remand for new trial.

### V.

We have considered appellant's remaining assignments of error and find them to be without merit.

Reversed and remanded for new trial consistent herewith. Costs to appellants, no attorney fees awarded on appeal.

JOHNSON, J. and McFADDEN, J., Pro Tem., concur.

SHEPARD, J. sat but did not participate due to his untimely death.

. . . .

BAKES, C.J., concurring in part and dissenting in part:

I concur in that part of the Court's opinion which concludes that 'the trial court was correct in ruling that the elements for establishing negligent misrepresentation were not proved and, therefore, the jury verdict for plaintiff cannot stand and must be vacated.' Ante at 19. Having thus concluded 'that the plaintiff did not present substantial competent evidence bringing this case within that doctrine . . . ,' the balance of the Court's discussion in the opinion regarding the elements of a cause of negligent misrepresentation under the Restatement (Second) of Torts, § 552, is unnecessary dicta, and will only tend to confuse the law of this state, particularly in view of our recent decision in the case of Idaho Bank & Trust v. KMG Main Hurdman, [115] Idaho [1082], 772 P.2d 720 (1989), in which this Court just this year, when urged to adopt the tort of negligent representation as set out in Restatement (Second) of Torts, § 552, stated, 'We decline to adopt the Restatement standard.' [115] Idaho at [1084], 772 P.2d at 722. The Court having recently spoken on that issue, the Court's dicta today is unfortunate.

I dissent from the Court's decision ordering a new trial in this case. The majority reverses the trial court's judgment notwithstanding the verdict and denial of a new trial, holding that '[t]he tendering to the jury of an inapplicable legal theory was certainly an irregularity in the proceedings, and an abuse of discretion which prevented Hudson from having a fair trial.' Ante at 20. However, the parties chose the theory upon which they tried the case, and this Court has consistently held that 'the parties to an action are bound by the theory on which they try it.' Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., 52 Idaho 766, 776, 22 P.2d 147, 150 (1933); Aetna Casualty & Surety Co. v. Wedgwood, 57 Idaho 682, 687, 69 P.2d 128, 129 (1937). It is difficult for me to understand how it can be an 'irregularity' or 'an abuse of discretion' to submit a case to the jury upon the theories which the parties select, and to which no objection is made. And I certainly hope that the majority opinion today does not stand for the proposition that every time a trial court grants a judgment notwithstanding the verdict, it must also grant a new trial because an 'inapplicable legal theory' has been tendered to the jury which, as a matter of law, is an 'irregularity in the proceedings, and an abuse of discretion

which prevent [the litigant] from having a fair trial.' *Ante* at 20.

1989 Slip Op. 16–22 (emphasis in original).

## DISSENT FROM THE DENIAL OF APPELLANT'S PETITION FOR REHEARING

BISTLINE, Justice, dissenting from the denial of appellant's Petition for Rehearing.

Hopefully there will never be a case where a party litigant has been treated to such a display of judicial error as has been visited upon Wayne Hudson, the plaintiff. In a nutshell, the district court destroyed his case by trying to help him—notwithstanding that he was represented by competent counsel. The district court, of its own volition and aided by a law clerk and certainly acting on no instigation by the defendants or their counsel, came to the conclusion that Mr. Hudson's counsel was pursuing redress on what the district court, with the extensive help of the law clerk, believed to be the better and the proper theory, to wit, *the theory of negligent misrepresentation.* Over the objections of all counsel, representing both the plaintiff and the defendants, at the close of the trial, the court gave the jury the court's instruction as to the elements necessary to determine liability for negligent misrepresentation and damages.

The jury found for the plaintiff, *utilizing the court's* instruction. Thereafter, the court, on reflection, determined that, well, shucks, counsel had been right after all, and the theory of negligent misrepresentation had been erroneously submitted to the jury. Accordingly, having led the jury into error, over well-voiced protests in the form of objections, the court threw out the jury's verdict and entered a judgment *non obstante veredicto* favorable to the defendants. Thereafter the court denied Mr. Hudson's motion for a new trial, a new trial at which a jury would be allowed to decide the defendants' culpability and liability for damages according to Mr. Hudson's (and his counsel's) theory of liability upon which they had relied beginning with the first pleading.

How did such a strange affair come about? Only because the district court on an abrupt change of mind decided that there was not in Idaho a recognized cause of action for negligent misrepresentation. So, the district court concedes there was error prejudicial to *the defendants* in having allowed that theory to be presented to the jury. It would not have any lingering prejudicial effects on the defendants, however, because the jury's verdict and judgment thereon were set aside as just stated.

All considered, the district court was so diligent in correcting the error which the it saw that it had visited upon the defendants, that in doing so the court completely overlooked what has always been done in such circumstances, namely, tender apologies to all concerned, set a new trial date, try the case a second time on the theories that able counsel for both sides had presented, and await the verdict of the jury. Judicial history is replete with cases which have had to be tried more than once before an error-free trial was had. Sometimes the error is caused or invited by counsel, but not in this case. It was the court's error, plain and simple, and it was by the district court so conceded and admitted.

If there is lurking somewhere a valid precedent, or even a reason for the strange happenings in district court, *i.e.,* the court on its own initiative giving the jury instructions on a theory of negligent misrepresentation, and thereafter granting a judgment n.o.v. without simultaneously setting the case for a second trial, I am unaware of it. District courts are capable of being both right and wrong. A district court, which is one judge unlike the appellate courts which are comprised of three or five members, does not enjoy the luxury of input of either three or five points of view, which is a great advantage. In this particular case, as a matter of routine, it is believed that one thousand out of one thousand attorneys would have expected that an appeal would have resulted in a routine reversal of the district court, and a remand with di-

rection for a new trial. At one time when the case first came before this Court an opinion did issue which reversed the district court and remanded the case back to the district court for a new trial, a not unusual happenstance where a collegial court of five members reviews the rulings of a one-member trial court. Had the case ever gone again to the jury in an error-free trial, all would have ended well. By a jury verdict justice would have been done, such being true no matter who prevailed. However, a rehearing was petitioned for and for reasons unknown was granted. A new opinion was issued by the Court which by that time had become differently constituted. The earlier opinion was cancelled without explanation as to why, or how error was discovered in the first opinion's statement of facts or application of the law. The Court now concludes that a new trial was not merited. How the Court arrived at that conclusion I know not, am unable to discern, and will never understand. What is known was that it cannot be the law that a party who presents his case to a jury and prevails, and then finds his success overthrown by reason of the error committed by district court, is certainly entitled to a new trial free of the district court's improper interference.

My humble efforts at swaying the court in a proper direction had little effect. Worse yet, the effort on my part must have been extremely shabby, as not one of the four comprising the majority felt obliged to write one word in response, thereby acquainting me with wherein I was misguided or mistaken. Now, counsel for Mr. Hudson have had their try at causing the Court to do the ordinary, i.e., recognize how grossly inappropriate it was for a district court to grant a judgment n.o.v. because of the district court's own error in forcing both parties to go to trial on a theory of defendants' liability which was wholly the making of the district court itself.

One can tell at a glance that considerable time and effort has gone into Mr. Hudson's brief supporting his petition for a rehearing. Rather than to attempt paraphrasing its content, a labor for which presently there is no allottable time, and which might do that brief an injustice, I append it as Attachment A, hoping that it might give the other members of the Court some pause, but confident that it will enlighten any of the trial bar who may have doubted my credulity in what I earlier wrote.

The issue is not debatable. Error was committed, and it was not chargeable to Mr. Wayne Hudson. What is more bothersome is the Court's insistence at perpetuating this monumental miscarriage of justice by *not* doing as it has often done—simply remanding to the district court with the request that the district court, now three or more years the wiser and experienced, reconsider. For my part there is no doubt that the district court would relish the opportunity, especially as against being forever saddled as the author of a most unfortunate decision which threw out a jury's verdict and dismissed the case, thereby specifically precluding a second jury trial at which the plaintiff could have the jury reach a decision on his theory of the case instead of on the theory imposed on both parties by the district court.

Attachment A.

I.

STATEMENT OF THE CASE

A. INTRODUCTION.

In its second opinion in this case, filed June 19, 1990, this Court summarily concluded that the facts of this case were not sufficient to establish a duty necessary to make out a prima facie case in tort and so affirmed the judgment n.o.v. entered in favor of Defendants Cobbs and Kennevick. Plaintiff Hudson petitions this Court for rehearing and submits that this Court erred in its conclusionary opinion. The facts of this case establish that Cobbs, Kennevick and Mark Bazeghi owed a duty, independent of contract, to Hudson and the Idaho First National Bank ("the Bank"), as defined by the common law of negligent nondisclosure and constructive fraud. This

duty was breached and Cobbs and Kennevick should be held liable in tort.

Hudson also submits that he was denied his right to a fair jury trial, free from prejudicial error, when the trial court, on her own motion and over Hudson's objection, submitted the negligent misrepresentation cause of action to the jury and then granted judgment n.o.v. as the result of such submission and the verdict of the jury.

B. CLARIFICATION AND SUPPLE-
 MENTATION OF THE STATEMENT
 OF FACTS.

Hudson disputes the Statement of Facts set forth in the Court's second opinion because of the glaring omission of relevant facts and relevant legal doctrine, as discussed below.

SIGNIFICANCE OF THE LEASE TO THE
 PROFESSIONALS, INC. IN CON-
 JUNCTION WITH COBBS–KENNEV-
 ICK LEASES.

No mention is made of The Professionals, Inc. The lease to The Professionals, Inc., in conjunction with the two Cobbs/Kennevick leases, *was a composite* in the plan to induce Hudson to conclude that Webster # 3 had met the Bank's preleasing requirements. These three leases were to have generated the sum of $4,784.14 per month in rental income, which represented 72% of Hudson's monthly $6,645.83 loan payment to the Bank. (Exh. 89) Prior to submitting these three leases to Hudson for his approval, Mark Bazeghi had proposed that Webster # 3 lease 12,200 square feet of the office space with the right to sublease. In the alternative, Bazeghi proposed that Webster # 3 pay Hudson $50,000.00 in cash if Hudson would assume the leasing requirement. (Tr.Vol. 3, p. 405–407; R.Vol. VII, p. 1833, L. 14–21; Exh. 9) Hudson rejected both alternatives. The Bank would likewise have rejected these alternatives. (Tr.Vol. 3, p. 407–408; R.Vol. VII, p. 1833, L. 21–26) The leases to Cobbs/Kennevick cannot be considered in isolation from the lease to

The Professionals, Inc. Each was used as intended to make up the deficiency in fulfilling the preleasing requirement. The lease to The Professionals, Inc. shows the intent and purpose of Cobbs in aiding Mark Bazeghi. See the discussion covering The Professionals, Inc. at p. 29.

### BETHLAHMY AND TUSCH—THE GOVERNING LAW

The Court has omitted discussion of the governing law as expressed in *Bethlahmy* and *Tusch*, each of which involved a contract and in each a duty in tort was found to exist. These cases cannot be distinguished from the present case. No lawyer worth his keep would have advised Hudson to sue in contract on the "straw leases" and not in tort. See the discussion on this point at p. 16.

### NEGLIGENT MISREPRESENTATION INSTRUCTION SUBSUMES TORTS OF NEGLIGENT NONDISCLOSURE AND CONSTRUCTIVE FRAUD

This Court ignored the fact that the "negligent misrepresentation" instruction given by the Court, Instruction No. 40, when considered with Instruction No. 43, was broad enough to subsume the torts of negligent nondisclosure and constructive fraud. See the discussion on this point at p. 23.

### JOINT TORT–FEASORS

The fact that Cobbs/Kennevick and Mark Bazeghi were joint tort-feasors in their concerted effort to induce Hudson to complete the purchase of the office building has been ignored by this Court in its opinion. The entire complexion of this case is affected by this fact. Surely the Court does not intend to extend the benefits of this doctrine to some litigants and not to others. See the discussion on this point at p. 25.

### TRIAL COURT'S FINDINGS IGNORED BY COURT

The trial court found that Mark Bazeghi advised Cobbs "that there was a construc-

tion loan which needed to be converted to long term financing and that the leases would be used for that purpose." (R.Vol. VII, p. 1834) Cobbs also testified that, at the time he entered into the leases, Mark Bazeghi had told him that there was a purchaser who desired to buy the building and that he (Bazeghi) was trying to get the building leased so that long term financing could be consummated. Cobbs also knew that if enough square footage were leased, the long term financing would be approved by the Bank. (R.Vol. VII, p. 1837) Cobbs also testified that Mark Bazeghi told him that the leases would be used to secure a buyer. (R.Vol VII, p. 1838)

In addition, the trial court found that during the course of this transaction, Hudson was diagnosed as having a malignant brain tumor in October, 1980. Surgery was performed in late November. Hudson underwent radiation therapy in February, 1981. He underwent additional surgery on March 6, 1981, which was followed by more radiation therapy. Mark Bazeghi was aware of Hudson's brain cancer. (R.Vol. VII, p. 1833) Cobbs testified that Mark Bazeghi had told him "that the potential buyer was ill and unable to obtain any leases and that Mark Barzeghi was obtaining them for him." (R.Vol. VII, p. 1837)

The trial court concluded that neither Hudson nor the Bank was ever advised of the secret arrangement between Cobbs and Kennevick and Mark Bazeghi and that, "had the Bank been aware of the nature of the agreement, it would not have approved the long term financing ..." because the preleasing condition would not have been met. (R.Vol. VII, p. 1836)

### WEBSTER # 3'S PAYMENT OF RENT

The Court states in the opinion that on July 1, 1981, Webster # 3 and Hudson entered into their final agreement, under which "Webster # 3 agreed to pay rent on any preleased space not actually occupied by lessees or sublessees." *This is incorrect.* The last agreement was on June 24, 1981, the import of which was that Webster # 3 agreed to *guarantee* the rent pay-

ments of nonoccupying lessees. Webster # 3 also agreed to manage the office building and collect the rent from the lessees. In Webster # 3's accounting for the month of July, 1981, it shows rent having been paid by Cobbs and Kennevick in the amount of $4,033.72. (Exh. No. 19) Hudson never at any time agreed to look solely to the credit of Webster # 3, but instead relied on the credit of the primary obligors under the leases. *The jury so found.*

It is important to note that Kathy Bazeghi, an attorney, was the principal draftsman of the June 24, 1981, implementing agreement. As Hudson testified, he was substantially distracted during the period of his illness and felt it was imperative to trust the people with whom he was dealing. (Tr.Vol. 3, p. 400–401, 404, L. 15–24; R.Vol. VII, p. 1833, L. 7–13)

### COURT'S ERRONEOUS ASSUMPTION THAT HUDSON BROUGHT NEGLIGENT MISREPRESENTATION ACTION

This Court states in the opinion that "(a)t the close of the jury trial on Hudson's fraud and negligent misrepresentation action ..." Hudson did not plead a cause of action based upon negligent misrepresentation, nor did he consent to the trial of this cause of action. Hudson also objected to the giving of Instruction No. 40. The jury, in answers to Special Interrogatories, found that Cobbs and Kennevick had negligently made false representations of past or existing facts to Hudson, that Hudson was not aware that such representations were false, that Hudson relied on these false representations, that he was damaged thereby and that the acts of Cobbs and Kennevick were an extreme deviation from reasonable standards of conduct, and were performed by these individuals with an understanding or disregard of their likely consequences. (R.Vol. VI, p. 1513–1517, Q. Nos. 12–17) The failure on the part of Cobbs/Kennevick to disclose their intent not to be bound under the leases and the true financial condition of The Professionals, Inc., constituted negligent nondisclosure and/or constructive fraud. See the discussion on this point at p. 32.

## II.

ISSUES PRESENTED ON REHEARING

A. This Court's ruling presents the following issues:

1. Was there a duty in tort owed to Hudson by Cobbs and Kennevick, apart from the contractual duty of performance of the lease agreements? If so, was this duty breached?

2. Were Cobbs/Kennevick and Mark Bazeghi joint tortfeasors?

3. Do the acts and omissions of Cobbs, Kennevick and Mark Bazeghi constitute "mere nonfeasance, which is insufficient to establish a duty in tort" when Cobbs, Kennevick and Mark Bazeghi, acting jointly failed to disclose to the Bank and Hudson the intent of Cobbs and Kennevick not to be bound by the Cobbs/Kennevick lease agreements, the existence of the hold harmless agreements and the facts relating to The Professionals, Inc.

4. Was the jury adequately instructed on negligent nondisclosure and constructive fraud?

B. Was Hudson denied his right to a fair jury trial, free from prejudicial error? The trial court, on its own motion and over the objection of Hudson, submitted to the jury the "negligent misrepresentation" cause of action, which was neither pleaded by Hudson nor tried with his consent, and then granted a judgment n.o.v. on the grounds the Court erred when it submitted the "negligent misrepresentation" cause of action to the jury? Hudson's requested jury instructions covering negligent nondisclosure were refused.

## III.

### ARGUMENT

A. THIS COURT'S RULING THAT COBBS, KENNEVICK AND MARK BAZEGHI DID NOT OWE A DUTY IN TORT TO HUDSON IS NOT SUPPORTED EITHER BY THE FACTS OR BY CASE LAW AND IS ERRONEOUS.

Hudson submits that this Court should reconsider its conclusions that "the facts of this case were not sufficient to show the duty necessary to make out a prima facie case for negligent misrepresentation," and that "while Hudson could have sued Cobbs/Kennevick in contract for breach of their lease agreement, he had no cause of action in tort." These conclusions were based upon an abbreviated quotation from *Carroll v. United Steel Workers of America,* 107 Idaho 717, 719 (1984):

> An alleged failure to perform a contractual obligation is not actionable in tort...." to found an action in tort, there must be a breach of duty apart from *nonperformance* of a contract." [Quoting *Taylor v. Herbold,* 94 Idaho 133, 483 P.2d 664 (1971) ].... Mere nonfeasance, even if it amounts to a willful neglect to perform the contract, is insufficient to establish a duty in tort. 1990 Opinion No. 90, pp. 8–9. (Emphasis in original)

Hudson asserts that these conclusions are erroneous for the following reasons:

First, the facts establish that Cobbs and Kennevick owed a duty to Hudson and the Bank, separate and apart from the performance of the contractual obligations under the lease agreements. The jury verdict, when considered in light of Instructions No. 40 and 43, establishes that Cobbs and Kennevick wrongfully invaded an interest of Hudson protected by law, as defined by the torts of negligent nondisclosure and constructive fraud, if not negligent misrepresentation.

Second, the facts of this case fall within the exception to the general rule that mere nonfeasance is insufficient to establish a duty in tort, as Cobbs and Kennevick made a representation without the present intent to perform and then failed to disclose such intent or the hold harmless agreements or the true facts about The Professionals, Inc., thereby breaching the duty defined by the torts of constructive fraud, negligent nondisclosure, negligent misrepresentation and fraud.

Third, the cases relied upon by the majority, including *Carroll v. United Steel*

*Workers of America,* 107 Idaho 717 (1984) and *Taylor v. Herbold,* 94 Idaho 133 (1971), are not applicable to this case, as not one of the cases cited by the majority involved the making of a promise when the promisor had no intent to be bound by the promise at the time the promise was made.

Fourth, the majority's decision in this case that there was no duty in tort directly contradicts its holdings in *Tusch Enterprises v. Coffin,* 113 Idaho 37 (1987) and *Bethlahmy v. Bechtel,* 91 Idaho 55 (1966), that the party to a contract has a duty in tort to exercise reasonable care to disclose known material facts.

Fifth, this Court improperly denied to Hudson the application of the law governing joint tort-feasors, without any explanation.

Sixth, this Court disregarded, without explanation, the material facts involving The Professionals, Inc. and Lyle Cobbs, acting in his capacity as a licensed real estate broker for Hudson.

1. COBBS AND KENNEVICK BREACHED A DUTY INDEPENDENT OF THE LEASE AGREEMENTS, AS THEY MADE AN OFFER (A REPRESENTATION) AND THEN FAILED TO DISCLOSE THE SECRET HOLD HARMLESS AGREEMENTS AND THEIR INTENT NOT TO BE BOUND.

As noted in the Court's second opinion, an action in tort requires a showing that there is a breach of duty imposed by common law or statute, independent of the contract. This Court, in *Carroll v. United States Steel Workers of America,* supra, described this requirement:

> A tort requires the wrongful invasion of an interest protected by law, not merely an invasion of an interest created by the agreement of the parties. *Carroll v. United Steel Workers of America,* 107 Idaho 717, 719 (1984), quoting *Just's, Inc. v. Arrington Construction Company,* 99 Idaho 462 (1978).

Prosser & Keeton characterize this requirement as follows:

> Tort obligations are in general obligations that are imposed by law—apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others. By injury here is simply meant the interference with the individual's interest or an interest of some other legal entity that is deemed worthy of legal protection. Keeton, Prosser & Keeton on the Law of Torts, 5th Ed., (1984) § 92 p. 655.

This Court recently held that "a breach of a separate duty to act reasonably will suffice" to establish a cause of action in tort, independent of the contract. *Reynolds v. American Hardware Mutual Insurance,* 115 Idaho 362, 365 (1988). Therein, this Court concluded that a tort action can be sustained against an insurance company which negligently fails to timely settle an insurance claim.

This duty has also been defined as a duty of reasonable care:

> One owes the duty to every person in our society to use reasonable care to avoid injury to the other person in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such injury. *Gibson v. Hardy,* 109 Idaho 247, 250 (App.1985), quoting *Alegeria v. Payonk,* 101 Idaho 617, 619 (1980).

The majority, in its opinion, failed to consider the clear and definite distinction between a promise and a representation.

> Contract obligations are created to enforce promises which are manifestations not only of a present intention to do or not to do something, but also of a commitment to the future. They are, therefore, obligations based on the manifested intention of the parties to a bargaining transaction. Generally speaking, there is a fundamental distinction between a representation and a promise. *A representation is a statement by the representer as to his existing state of mind regarding the existence of a past or present fact.* Therefore, such liability as is im-

posed on a represeter for stating something that proves to be false must be based on a tort theory. Keeton, supra, § 92 p. 656. (Emphasis Added).

This distinction is important, since contract actions "are created to protect the interest in having promises performed." *Just's, Inc. v. Arrington Construction Company,* 99 Idaho 462, 468 (1978) quoting W. Prosser, Handbook of the Law of Torts, § 92 at 613 (4th Ed. 1971).

Thus, in a contract action, a manifestation of consent is a prerequisite to the contract claim. But, in the case at bar, the purported manifestation of consent by Cobbs and Kennevick was the tort itself. That is, the tort occurred when Cobbs and Kennevick delivered the lease agreements, signed by the lessee, *but not yet signed by the owner,* to Mark Bazeghi, without disclosing to the Bank or Hudson, or without causing Mark Bazeghi to so disclose, the existence of the hold harmless agreements, or that at the time of the delivery of the leases, Cobbs and Kennevick considered them to be "straw leases" not intending to be obligated under the leases to Hudson, the Bank or any other person. The tort occurred not at the time the contract was formed, i.e.; when Hudson signed the leases, but when Cobbs and Kennevick made the offer by signing the leases and delivering them to Mark Bazeghi. The contracts were formed when Hudson signed them, relying on the representations of Cobbs and Kennevick that the leases were valid contracts under which they intended to be obligated. The leases were the instrumentality used by Cobbs and Kennevick to make the representation, but the contract was not the basis of the liability. Cobbs and Kennevick's decision to execute and deliver the lease agreements created "a state of things which furnish[ed] the occasion for a tort." *Taylor v. Herbold,* 94 Idaho 133, 138 (1971). The failure to disclose the known facts was negligent and constructively fraudulent.

Instruction No. 40 did properly set forth this distinction. The jury was instructed that it must find "that the leases signed by Lyle Cobbs and Jack Kennevick constituted

a statement of past or existing facts to Wayne Hudson" and that "the statement was false" when made. Instruction No. 43 was supplementary and prescribed the duty to disclose known material facts.

Stated simply, if Cobbs and Kennevick had not failed to disclose to Hudson and the Bank the fact that neither of them intended to be obligated under the leases, there would have been no leases entered into between Hudson and Cobbs/Kennevick. If Cobbs and Kennevick had not failed to disclose to Hudson the true facts about The Professionals, Inc., Hudson would not have signed that lease. But for the tort of negligent nondisclosure or constructive fraud, there would have been no lease contracts for this Court to discuss.

This case involves the breach of a duty imposed by law, i.e., the duty to disclose known material facts and thereby avoid injury to others. This duty is defined with particularity by the torts of constructive fraud and negligent nondisclosure, as will be discussed below, leaving negligent misrepresentation aside. If the Bank had not elected to bid the debt at the foreclosure sale, it too, as well as Hudson, could have brought a tort cause of action for breach of the duty for any damage it suffered.

2. THIS COURT ALSO ERRONEOUSLY CONCLUDED THAT THIS CASE INVOLVES ONLY NONFEASANCE, I.E., THE FAILURE OR NEGLECT TO PERFORM A PROMISE, AND DOES NOT INVOLVE A BREACH OF AN INDEPENDENT DUTY.

The second leg supporting the majority's conclusion is its application of the principle that "mere nonfeasance, even if it amounts to willful neglect to perform the contract, is insufficient to establish a duty in tort." This Court, however, failed to consider the longstanding exception to the rule of nonliability for nonfeasance—"that a promise made without the intent to perform it may be fraud for which a tort action in deceit will lie." Keeton, supra, § 92, p. 664.

In Idaho, this distinction is defined as an exception to the general rule that a repre-

sentation consisting of a promise or a statement as to a future event will not serve as the basis for fraud:

As in many cases, the general rule has almost become the exception. Idaho recognizes two exceptions to the general rule about statements or promises *in futura;* (1) fraud may be predicated upon the non-performance of a promise in certain cases *where the promise is the device to accomplish the fraud. Pocatello Security Trust Co. v. Henry,* supra; *Miller–Cahoon Co. v. Wade,* 38 Idaho 484, 221 P. 1102 (1923); (2) in cases where promises are blended or associated with misrepresentations of fact, there is fraud if a promise is accompanied with statements of existing facts showing the ability of the promisor to perform the promise without which it would not have been accepted or acted upon. *Pocatello Security Trust Co. v. Henry,* supra; *Keane v. Allen,* 69 Idaho 53, 202 P.2d 441 (1949). Opinions or predictions about the anticipated profitability of a business are usually not actionable as fraud. *However, when there is an affirmative promise or statement that a certain act will be undertaken, such a statement is actionable providing the other elements of fraud are shown. Sharp v. Idaho Investment Corporation,* 95 Idaho 113, 122–123 (1972). (Emphasis Added).

Although the courts frame this exception in terms of a promise made without the intent to perform, what is actually involved is a representation, as that term is defined by Keeton, supra, § 62 p. 656. A promise made without the present intent to perform is actually a statement by the actor, "as to his existing state of mind regarding the existence of a ... present fact"—his present intent to perform. Keeton, supra, § 92 p. 656. In contrast, promises are manifestations of a present intent as well as a commitment to the future. Keeton, supra, § 92 p. 656.

As noted by Harper, James & Gray in their treatise:

... the promise itself is generally regarded as a representation of a present intention to perform. Hence, such a promise, made by one not intending to perform, is a misrepresentation—a misrepresentation of the speaker's present state of mind—and is actionable as a misrepresentation of fact. Harper, James & Gray, Law of Torts, Vol. 2, § 7.10, p. 447 (2d Ed., 1986).

Accord, Keeton, supra, § 109, p. 763.

Here, Cobbs and Kennevick misrepresented to Hudson and the Bank their existing state of mind regarding their present intent to be bound by the leases. Cobbs and Kennevick, by making the offer to Hudson to enter into the leases, made representations to Hudson that they intended to be bound by the agreements. They failed to disclose the falseness of these representations.

Moreover, the conduct of Cobbs and Kennevick involves active negligence or misfeasance. Cobbs and Kennevick decided, of their own free will, to deliver the signed leases to Mark Bazeghi, knowing at the time that the Bank and Hudson would rely upon the representation of Cobbs and Kennevick that they intended to be bound by the leases, while at the same time, failing to disclose to Hudson or the Bank the hold harmless agreements and their intent not to be bound. The tort was committed before the lease contracts were formed, when Cobbs and Kennevick undertook an affirmative act, the delivery of the signed leases to Mark Bazeghi. This case involves not a question of nonfeasance, but a question of misfeasance, the affirmative act of delivering the leases, knowing at the time that they intended not to be bound and that they would rely upon the secret hold harmless agreements to protect them from liability.

3. THE CASES RELIED UPON BY THE MAJORITY, INCLUDING *CARROLL V. UNITED STEEL WORKERS OF AMERICA,* 107 IDAHO 717 (1984) AND *TAYLOR V. HERBOLD,* 94 IDAHO 133 (1971) ARE NOT APPLICABLE TO THIS CASE.

Not one of the cases cited by the majority to support its conclusions involve the

making of a promise when the promisor had no intent to be bound by the promise at the time the promise was made.

*Taylor v. Herbold,* supra, involved the breach of a promise by the buyer to purchase potatoes. After formation of the contract, the defendant buyer assured the plaintiff on several different occasions that he would perform under the contract and buy the potatoes. 94 Idaho 135. The plaintiff did not make any allegation that the defendant potato buyer misrepresented his intention to be bound by the contract at the time the contract was formed.

*Steiner Corp. v. American District Telegraph,* 106 Idaho 787 (1984) involved the allegation that the defendant failed to performed its contractual duty to inspect and maintain the fire alarm system. The contract was originally entered into in 1964 and then a new contract was entered in 1970 by the parties. Again, there was no allegation that the defendant had any intent not to perform the contract when it was entered into.

*Carroll v. United Steel Workers of America,* 107 Idaho 717 (1984) involved a Collective Bargaining Agreement. The plaintiff alleged that the defendant union had failed to perform under this agreement, but again, there was no allegation that the defendant union did not have the intent to perform its contractual obligations when the agreement was formed.

*Brown's Tie & Lumber v. Chicago Title,* 115 Idaho 56 (1988) arose from the failure of the title insurance company to disclose, in a verbal update, a deed of trust which was recorded after the formation of the initial contract, the issuance of a title insurance commitment. There was no allegation that Chicago Title did not have the intent to perform its contractual obligations when the contract was formed.

In contrast, this Court has held that nonfeasance by an insurance agent, i.e., the failure to procure insurance, gives rise to both a breach of contract action and to a tort action arising from the negligent breach of a professional duty to provide insurance. *McAlvain v. General Insur-*

*ance Company of America,* 97 Idaho 777 (1976); *Keller Lorenz Company v. Insurance Associates Corporation,* 98 Idaho 678 (1977).

4. THIS COURT'S CONCLUSION THAT THERE WAS NO DUTY IN TORT IS IN DIRECT CONFLICT WITH ITS HOLDINGS IN *TUSCH ENTERPRISES V. COFFIN,* 113 IDAHO 37 (1987) AND *BETHLAHMY V. BECHTEL,* 91 IDAHO 55 (1966). A PARTY TO A CONTRACT HAS A DUTY IN TORT TO EXERCISE REASONABLE CARE TO DISCLOSE KNOWN MATERIAL FACTS.

a. *Bethlahmy and Tusch.*

This Court has held that a party to a contract has a tort duty, independent of the contract, to disclose to the other contracting party "a fact that he knows may justifiably induce the other to act or refrain from acting." Restatement of Torts, 2d, § 551(1), as adopted by this Court in *Tusch Enterprises v. Coffin,* supra, and *Bethlahmy v. Bechtel,* supra. Yet, for some inexplicable reason, this Court did not even discuss in its current opinion the duties defined by the torts of constructive fraud and negligent nondisclosure. *It is impossible to reconcile* this Court's opinion in the Hudson case, with its earlier opinions in *Tusch* and *Bethlahmy.*

In *Bethlahmy,* this Court found that the defendant home builder had a duty to disclose to a home buyer that there was a ditch running under the lot and garage of the house and that the basement was not of waterproof construction. This failure to disclose, in combination with the defendant's representation that the house would be a quality home, breached the duties defined by the common law of constructive fraud and negligent nondisclosure. The Court concluded that the plaintiff had the right to rescind the contract, because the defendant committed these torts.

Similarly, this Court concluded in *Tusch Enterprises,* supra, that the seller had a tort duty under the common law of constructive fraud and negligent nondisclosure

to disclose to the buyer that a duplex was built upon fill dirt and that problems with the duplex's foundation were likely to occur because of the use of the fill dirt. In *Tusch*, the Court also concluded that the plaintiff could not maintain a contract action based upon the breach of an express warranty, as the parol evidence rule precluded the introduction of any oral evidence to establish the making of an express warranty in derogation of the written agreement.

Additional support for the holdings in *Tusch* and *Bethlahmy* is found in a very recent case *Petry v. Spaulding Drywall*, 117 Idaho 382, 788 P.2d 197 (1990), wherein this Court concluded that "silence may be construed as a representation where the other party might be led to a harmful conclusion." Silence may be the basis for constructive fraud. (788 P.2d 199–200)

Thus, *Bethlahmy, Tusch* and *Hudson* present the inherently contradictory decisions that a contracting party has a duty in tort to disclose matters deemed material to the making of the contract, but does not have a duty in tort to disclose his intent not to be bound by the contract. It is submitted that there is *no* fact more basic to the formation of a contract then the party's representation that he intends to be bound by the terms of the contract. *If it constitutes fraud to make a promise without the intent to perform—how can it be argued seriously that the person making such promise has no duty in tort to disclose his intent not to be bound?*

### b. *Why This Gross Result?*

A reader of this Court's opinion would conclude that this Court believes for some unstated reason that Hudson is not entitled to be compensated for his tremendous monetary loss in this case—all caused by the gross negligence of Cobbs and Kennevick—even when his additional out-of-pocket expenses for attorney's fees and costs are in the hundreds of thousands of dollars, all of which have been paid. The same reader would also conclude that this Court must have overlooked or completely disregarded

firmly established precedent of this Court—the settled law covering negligent nondisclosure, constructive fraud and joint tort-feasors. One must respectfully ask, how can the above result be reached if this Court did apply such settled law to the facts of this case and the gross misconduct of Cobbs and Kennevick?

Perhaps this Court believes that since Hudson had already paid his $250,000.00 down payment on the purchase of the office building prior to the execution and delivery of the lease by Cobbs/Kennevick and The Professionals, Inc., he was not relying on those leases in deciding to complete the purchase of the office building. Cobbs and Kennevick so argued in their Responsive Brief and in oral argument on appeal. This argument has no merit. What amounted to an interest free loan to Webster # 3 was part of the quid pro quo in the transaction. It was not until Hudson had checked into the financial capacity of Cobbs and Kennevick and had been advised of the financial capacity of The Professionals, Inc. that he decided to complete the purchase of the office building by entering into the June 24, 1981, implementing agreement. These facts were before the jury, which decided the issue. The foregoing is discussed in detail at pp. 19–21, and 35 of Appellant's Brief.

In addition, Hudson proved at trial that if he had brought a rescission action on July 1, 1981, as he testified he would have done, but for the loans to Cobbs/Kennevick and The Professionals, Inc., he would have prevailed in the action and been restored to his original position. The jury found, after having been properly instructed on the issues of proximate cause and reliance, that the grossly negligent misconduct of Cobbs/Kennevick was the proximate cause of all of the damages caused to Hudson as enumerated in Question No. 14 of the jury's Special Verdict. There was ample evidence addressed at trial from which the jury could properly so conclude. This issue is discussed in detail at pp. 8–9 of Appellant's Reply Brief.

Or, perhaps, as indicated by the Court's statement that "Webster # 3 agreed to pay

rent on any preleased space not actually occupied by lessees or sublessees," the Court misconceived the facts and believes that Hudson was looking solely to Webster # 3 to pay the rent payments due under the leases to Cobbs and Kennevick. That Hudson relied on the leases to Cobbs and Kennevick in making his decision to complete the purchase of the office building on June 24, 1981, is beyond question, *and the jury so found.* As pointed out at p. 2 hereof, prior to the delivery of the Cobbs/Kennevick leases, Hudson had refused Webster # 3's offer to lease the 12,200 square feet of office space the Bank had required to be pre-leased, and he had refused Webster's $50,000.00 cash offer if he would assume the leasing requirements. While Webster # 3 agreed to guarantee the rent payments of nonoccupying lessees, in the June 21, 1981, implementing agreement, Hudson assumed and relied on the fact that Cobbs and Kennevick were *primarily responsible* for the payment of approximately $4,034.00 per month for their two leases. This sum *alone* represented 61% of Hudson's monthly debt service requirement!

### c. *An Example.*

An example will demonstrate how absurd it is to argue, much less to conclude, that the present facts do not create a separate duty in tort. Assume that a major developer in Boise desired to construct and sell a ten story office building. The developer could not obtain financing for the project unless and until he obtained and delivered to the lending institution leases covering 80% of the space in the building. The developer has a purchaser who has committed to purchase the building, once constructed, if, but only if, the developer has in place good leases covering eight of the ten floors in the building. The lender will not commit to the loan until it knows that the rental income from the building will be sufficient to insure that the loan will be repaid. The buyer will not commit to purchase the building until he knows he will have sufficient rental income guaranteed in order to service his debt. The developer can construct the building for $10 million and can sell it to the buyer for $12 million—*if* the developer can secure the leases covering eight of the ten floors.

Assume further that the developer has received an assurance from an out-of-state major business that it will commit in the future to lease eight floors, but that it cannot sign the appropriate lease for 90 days. Interest rates are rising, however, and the developer wants to obtain the lender's commitment for financing now—before the increase occurs. The developer therefore meets with two substantial firms in Boise, explains his predicament to them, and asks each of them to sign a lease covering four floors in the building. He assures each that the out-of-state tenant will lease the eight floors in 90 days, that neither of the Boise firms will be obligated under the leases, and that he *just needs to use* their two leases in order to obtain the necessary financing and to conclude the sale of the building to the prospective buyer. Both of the Boise firms trust the developer, believe him and want to help him, so each signs a multi-year lease covering four floors of rental space in the building. Neither of the Boise firms intends to be obligated under the leases, and each fully expects the out-of-state firm to sign a lease 90 days later covering the eight floors. The two Boise firms sign the leases and deliver them to the developer, knowing that that the developer will use them to induce the bank to finance construction of the building and to induce the buyer to purchase same. Neither the developer nor either of the two Boise firms informs the bank or the buyer of the true state of the facts. Relying on these leases, the bank loans the $10 million and the buyer signs a contract to purchase the building for $12 million. The out-of-state business which had indicated it would lease eight floors in the building fails to do so, and the two Boise firms advise the bank and the buyer that the leases they signed were only "straw leases" *to be used by the developer* to obtain financing and sell the building, and that they never intended to be obligated under the leases.

Under existing Idaho law, is the only recourse for the bank or the buyer to sue

under the leases for breach of contract? Do the two Boise firms who signed these "straw leases," each having no intent to be bound under same, owe any duty in tort to the buyer? Do the two Boise firms owe a duty to disclose to the bank and the buyer facts which were known only to them and the developer and which they knew to be necessary in order to prevent the leases from misleading both the bank and the buyer?

The answers to these questions appeared to be obvious prior to the latest opinion in this case. It is submitted that no bank or buyer involved in a fact situation as presented above would elect to sue on the "straw leases." Until this opinion, it is submitted, no attorney practicing law in Idaho would advise his client to sue on the leases—much less advise his client that no duty in tort existed to disclose such facts. Negligent nondisclosure and constructive fraud, as enunciated in *Bethlahmy* and *Tusch*, apply. Just as obviously, the same principles are applicable to, and should be dispositive of, the fact situation in the present case.

### d. *Instructions Given Subsumed Negligent Nondisclosure and Constructive Fraud.*

It is submitted that what the trial court designated as the "negligent misrepresentation" instruction, Instruction No. 40, when considered with Instruction No. 43, was broad enough to subsume the torts of negligent nondisclosure and constructive fraud. Instruction No. 40 (copy in Appendix) is more restrictive—imposes a greater burden on Plaintiff to prove his case—than should be required for negligent nondisclosure. Instruction No. 43 (copy in Appendix) supplemented Instruction No. 40, and instructed the jury that a party has a duty to disclose known material facts when he knows that such facts are neither known by nor readily accessible to the other party. Instruction No. 43 also instructed the jury that "where one party is under no duty to speak, but nevertheless does so, he is bound to speak honestly and not to engage in misleading half truths.

For actual fraud, the plaintiff must prove that the speaker acted with an intent to deceive. Proof of this element is not required in negligent nondisclosure or constructive fraud. As the court stated in *Bethlahmy*: *"Assuming, as the trial court found, that this representation was not made with knowledge of its falsity or with intent to deceive, it was sufficient upon which to base an action in constructive fraud ... " Bethlahmy*, supra, at p. 61. (Emphasis added) Instruction No. 40, as supplemented by Instruction No. 43, more than adequately instructed the jury on the torts of constructive fraud and negligent nondisclosure, both of which are, as this Court depicted in its first opinion, "lesser included torts of fraud." Restatement (Second) of Torts § 551; *Bethlahmy* and *Tusch*, supra. See California Jury Instructions—Civil, 7th ed., BAJI No. 12.36, covering fraud and deceit—nondisclosure of known facts. (Copy in Appendix)

After considering all of the extensive evidence introduced during a trial lasting over a month, and after considering all of the instructions given by the Court, the jury found that Cobbs and Kennewick were *grossly negligent* in failing to disclose to Hudson material facts which were known to them but unknown to Hudson, and that such gross negligence was the proximate cause of Hudson's damages. The jury having been adequately instructed on the torts of constructive fraud and negligent nondisclosure, as alleged by Hudson in his Third Amended Complaint, and having found Cobbs and Kennewick to have committed said torts in a grossly negligent manner, this case should be concluded once and for all and the jury verdict reinstated.

Hudson's detailed argument covering the issue of negligent nondisclosure and constructive fraud is presented at pp. 59–69 and 69–77, respectively, of the Appellant's Brief, as augmented and expanded on at pp. 13–16 of the Memorandum in Support of Appellant's original Petition for Rehearing.

## 5. THIS COURT IMPROPERLY DENIED TO PLAINTIFF APPLICATION OF THE LAW GOVERNING JOINT TORT–FEASORS, WITHOUT ANY EXPLANATION.

The trial court's Memorandum Decision and Order and this Court's opinion are silent on the joint conduct of Mark Bazeghi, Cobbs and Kennevick. All acted in concert with each other to deliver "straw leases," including the lease to The Professionals, Inc. Each was delivered for the express purpose of inducing the bank to grant permanent, long-term financing and inducing Hudson to complete the purchase of the office building. The law governing the liability of joint tort-feasors is so established in our judicial system that nothing further should have to be said. However, since this Court has, for some reason not disclosed, elected not to discuss the issue, further elaboration seems appropriate.

It is difficult to conceive a factual situation in which it would be more obvious that the law governing joint tort-feasors should be applied. Mark Bazeghi testified that he had advised first Kennevick and then Cobbs of Bazeghi's desperate need for help prior to the signing of the leases by Cobbs and Kennevick. Bazeghi testified that "I explained to him that I needed some leases to comply with a lender requirement, and we were short, and seeking the solution for it ... and we had a deadline on the conversion of the construction financing to permanent financing" and that the deadline "was very close." (Tr.Vol 14, p. 2445, L. 8–11, 15–19, p. 2446, L. 1–3) Bazeghi testified "so I asked for his help. I asked him (Cobbs) to find tenants for me or perhaps come up with some kind of straw lease so we would comply with the bank's requirements ..." (Tr.Vol. 14, p. 2246, L. 6–7, L. 21–25)

Kennevick testified that the leases signed by Cobbs and Kennevick "were straw, meaningless documents, signed strictly to help Mr. Bazeghi to be able to get his long-term financing and that would be the end of it," (Tr.Vol. 8, p. 1166, L. 9–14) "were never intended from the start to be an enforceable lease," (Tr.Vol. 8, p. 1180, L. 1–4) and that the invalid and unenforceable leases would be useful "only to the extent that it would be able to let Mr. Bazeghi be able to get his minimum square footage rented on paper." (Tr.Vol. 8, p. 1181, L. 10–17) Cobbs likewise testified that the leases were signed by him and Kennevick so that Mark Bazeghi could get his long term loan, that Cobbs/Kennevick leased the property for that purpose "but with no intent to be liable on the lease to (Mark Bazeghi) or anyone else." (Tr.Vol. 8, p. 1269, L. 19–25, p. 1270, L. 1–5)

It seems apparent that there was "no intent to be liable" because they thought Bazeghi's hold harmless agreements would protect them. Asked whether he had any objection to Mark Bazeghi using the leases to obtain long term financing, Kennevick testified "No, I really didn't. I knew Mark Bazeghi very well. I knew Abbass and the other people involved with that in Webster 3. I knew them to be successful developers." (Tr.Vol. 15, p. 2624, L. 3–13) Cobbs obviously agreed with Kennevick's perception of Mark Bazeghi's financial capacity. Cobbs was shown Mark Bazeghi's silver and gold holdings prior to signing the leases. He testified "he (Mark Bazeghi) showed me his holdings at that time, and I know of his personal wealth. He showed it to me in cold silver, as well as gold, and hundreds of thousands of dollars." (Tr. Vol. 8, p. 1272, L. 7–16) Cobbs testified that when Mark Bazeghi opened up the safety deposit box and showed Cobbs his gold "(t)here were hundreds and hundreds of Kruggerands, and at that time they were selling, I recall, mentally figuring out that it represented close to half a million dollars in gold, Kruggerands, ... and I knew right then that this man, you know, was very wealthy." (Tr.Vol. 16, p. 2749, L. 13–23) When asked at trial whether Mark Bazeghi's display of wealth caused Cobbs to take more risk in the lease transaction than he normally would take, Cobbs testified "I think it played a part in it." (Tr.Vol. 16, p. 2819, L. 14–19)

Kennevick testified that he had assumed that Mark Bazeghi would be selling the office building and that he understood that a seller needed to have long term financing

approved in order to make it a marketable project. (Tr.Vol. 8, p. 1179, L. 2–5, 13–16) Cobbs testified that he was aware, when he signed the leases, that there was a possible purchaser for the building who had been ill. (Tr.Vol. 8, p. 1270, L. 6–12, 20–25) Cobbs also testified that he knew that if long term financing could be obtained on the office building, "it would be a help to consummate the sale somewhere down the line" to a prospective buyer. (Tr.Vol. 8, p. 1279, L. 11–24) Cobbs didn't even recall whether he had signed leases for two or three suites in the office building. He testified "I was there at the request of Mr. Bazeghi, and I would have at that time been willing to lease whatever he requested." (Tr.Vol. 16, p. 2777, L. 13–24)

The jury did not find that Cobbs and Kennevick intended that Hudson would be deceived as a result of their "straw leases" and their other representations acting in concert with Mark Bazeghi. This is irrelevant to a determination as to whether they, acting by themselves or jointly with Mark Bazeghi, committed the torts of negligent nondisclosure or constructive fraud.

Suffice it to say, Mark Bazeghi, Lyle Cobbs and Jack Kennevick acted jointly and in concert in their endeavors to present the Cobbs/Kennevick "straw leases" and the worthless lease to The Professionals, Inc. in order to induce the Bank to grant permanent financing and to induce Hudson to conclude the purchase of the office building. The jury, while finding that Plaintiff failed to prove the elements of common law fraud on the part of Mark Bazeghi, Cobbs and Kennevick, found that all three of them were guilty of gross negligence which was the proximate cause of Hudson's damages. In the words of the trial court, in commenting on certain of the evidence which had been introduced relating to the actions of Cobbs and Kennevick, that for Cobbs and Kennevick to sign the leases, knowing that they would be presented to a bank and that the bank would rely on them in deciding whether to grant permanent financing would be "at a minimum the kind of gross negligence, putting it in its kindest light, the kind of gross negligence that *Cheney* would be designed to deter." (Tr.Vol. 11, p. 1722, L. 19–25, p. 1723, L. 1–5)

It seems inconceivable that this Court can overlook these facts, as well as the law governing joint tort-feasors, and fail to conclude as a matter of law that the torts of negligent nondisclosure and constructive fraud, if not negligent misrepresentation, were committed by Cobbs and Kennevick and in so doing they were acting jointly with Mark Bazeghi.

The law governing the commission of torts by joint tortfeasors is discussed at pp. 56–58 of Appellant's Brief and pp. 16–20 of Appellant's Reply Brief.

6. THIS COURT DISREGARDED, WITHOUT EXPLANATION, THE MATERIAL FACTS INVOLVING THE PROFESSIONALS, INC. AND REAL ESTATE BROKER LYLE COBBS.

Neither the trial court's Memorandum Decision and Order nor this Court's substituted opinion takes into consideration the following facts concerning the procurement by Defendant Lyle Cobbs of the leases to the Professionals, Inc.:

a. Mark Bazeghi advised Hudson that Cobbs had procured a lease from The Professionals, Inc., which was a substantial firm of long standing with numerous clients.

b. Cobbs and Kennevick, with Neil Langrill, had been instrumental in forming the corporation.

c. It was Cobbs' and Kennevick's attorney who had formed the corporation, and some of the attorney's expenses therefor were billed to Cobbs' real estate firm.

d. Cobbs and Kennevick knew, at the time the lease was obtained, that the corpo-

ration had no assets or capital, but they failed to disclose such facts to Hudson.

e. Cobbs received a commission for procuring the lease.

f. Mark Bazeghi paid The Professionals, Inc. the sum of $4,500.00 to induce the corporation to sign the lease—an amount equal to six months rent under the lease. Although Cobbs testified at trial that he did not participate in this payment, he later admitted at trial that the $4,500.00 check had been made payable jointly to his real estate firm and The Professionals, Inc., and that he had personally endorsed the check.

g. Cobbs was a licensed real estate broker and knew that Hudson would be the owner of the building, once the preleasing requirements were met. Cobbs testified that as a real estate broker, he *only* procures the tenant—that it is the owner's responsibility to check on the credit of the tenant, not his.

A detailed description of the material facts involving the lease to The Professionals, Inc., with citations to the transcript, is set forth at pp. 33–37 of Appellant's Brief, and pp. 23–24 of Appellant's Reply Brief.

Again, it seems inconceivable that this Court can conclude as a matter of law, and do so without even the slightest reference or discussion, that Cobbs and Kennevick, and especially Cobbs, had no separate duty in tort to disclose these materials facts which were known by them and unknown to Hudson. *There is no contract* between Hudson and Cobbs/Kennevick in connection with The Professionals, Inc. lease. This Court cannot relieve Cobbs and Kennevick of responsibility for damage they caused to Hudson, when they induced him to rely on the lease to this sham corporation, by ruling that their only duty to Hudson was in contract. Instead, it is respectfully submitted, this Court must face the facts and deal with The Professionals, Inc. judicially. The Court must discuss the affirmative duty in tort to disclose known material facts in a business transaction, in accordance with the principles enunciated by the Court in *Bethlahmy* and *Tusch.*

**B. HUDSON WAS DENIED HIS RIGHT TO A FAIR JURY TRIAL, FREE FROM PREJUDICIAL ERROR, WHEN THE TRIAL COURT GRANTED A JUDGMENT N.O.V. ON THE GROUNDS THAT THE NEGLIGENT MISREPRESENTATION CAUSE OF ACTION SHOULD NOT HAVE BEEN SUBMITTED TO THE JURY. THE COURT SUBMITTED THE CAUSE OF ACTION TO THE JURY OVER HUDSON'S OBJECTION. HUDSON DID NOT PLEAD NOR CONSENT TO THE TRIAL OF THE NEGLIGENT MISREPRESENTATION CAUSE OF ACTION.**

The trial court imposed upon the litigants its own theory of the case, negligent misrepresentation, over the objection of both parties, and instructed the jury upon its view of negligent misrepresentation with Instruction No. 40. The Court did agree to supplement this instruction with Instruction No. 43, which prescribed the duty to disclose known material facts. The jury rendered a verdict for Hudson. The trial court, seven months later, no doubt from cold notes and faded memory, concluded that the trial court erred when it instructed the jury on negligent misrepresentation, and granted judgment n.o.v. to Cobbs and Kennevick.

The trial court's action resulted in prejudicial error to Hudson for two reasons:

(1) Hudson was denied his right to have the jury instructed upon his theory of the case, negligent nondisclosure and constructive fraud. (See Plaintiff's Requested Jury Instructions Nos. 57 and 58, in Appendix.)

(2) The jury was given a "false choice." The jury was led, by the trial court's own sua sponte instruction, to believe that it had two alternative legal theories, either of which could be the basis of liability against Cobbs and Kennevick.

528

**1. THIS COURT INCORRECTLY ASSUMED THAT PLAINTIFF HAD REQUESTED THE TRIAL COURT TO SUBMIT THE "NEGLIGENT MISREPRESENTATION" CAUSE OF ACTION TO THE JURY.**

At page 6 of its second opinion, the Court states: "At the close of the jury trial on Hudson's fraud and negligent misrepresentation action ..." Hudson did not plead a "negligent misrepresentation" cause of action in his Third Amended Complaint, he did not request the Court to instruct the jury on said cause of action, and, in fact, *objected* to the Court's submission of the cause of action to the jury. (Tr.Vol. 18, p. 3229, L. 19–25, p. 3230, L. 1–8) Negligent nondisclosure and/or constructive fraud was the thrust of Plaintiff's negligence cause of action. Consistent with such theories, Hudson submitted Requested Jury Instructions Nos. 57 and 58. (R.Vol. IV, p. 1178–1179) Copies of these requested Instructions are in the Appendix. The trial court refused to give Hudson's requested instructions specifically covering the failure of Cobbs and Kennevick to disclose to Hudson their intent not to be bound by the leases and essential information about The Professionals, Inc. Over the objection of Plaintiff and Defendants, the Court submitted Instruction No. 40 to the jury. While the trial court noted on Hudson's Requested Instructions Nos. 57 and 58 that they were given, these instructions were neither given nor covered by other instructions. Hudson did not request, consent to or acquiese in the submission of the case to the jury on what the trial court and now this Court refer to as the "negligent misrepresentation" cause of action.

**2. HUDSON WAS DENIED HIS RIGHT TO HAVE THE JURY INSTRUCTED ON HIS THEORY OF THE CASE.**

The relevant principles were summarized by this Court in *Garrett Freight Lines v. Bannock Paving Co.,* 112 Idaho 722, 730–731 (1987):

Litigants have a right to have the jury instructed on every reasonable theory presenting a basis of a claim or relief, or defense thereto, where such theory finds support in the pleadings and evidence. *Messmer v. Ker,* 96 Idaho 75, 524, P.2d 536 (1974); *Rosenberg v. Toetly,* 94 Idaho 413, 489 P.2d 446 (1971); *Hodge v. Borden,* 91 Idaho 125, 417 P.2d 75 (1966); *Domingo v. Phillips,* 87 Idaho 55, 390 P.2d 297 (1964); *Jones v. Mikesh,* 60 Idaho 680, 95 P.2d 575 (1939). Failure to instruct upon a party's theory of the case constitutes reversible error. *Sulik v. Central Valley Farms, Inc.* 95 Idaho 826, 521 P.2d 144 (1974); *Messmer v. Ker,* supra.

In this case, Plaintiff's Requested Instruction Nos. 57 and 58 were supported by the pleadings, the evidence, and the relevant case law. Yet the trial court elected to impose upon Hudson her own theory of the case and then, when the trial judge decided that she had selected the wrong theory of the case, she chose to correct the error by granting the judgment n.o.v. The trial court's failure to instruct upon Hudson's theory of the case constitutes reversible error, especially when the trial court's decision to impose her own theory of the case, over the objection of both parties, is considered.

See, *Robertson v. Richards,* 115 Idaho 628 (1989) wherein this Court ruled that the inadvertent omission of a proximate cause instruction in a medical malpractice case was prejudicial error, requiring a new trial, even though the jury found that the defendant doctor was not negligent.

**3. HUDSON WAS DENIED HIS RIGHT TO A FAIR TRIAL, FREE FROM ERROR, ON THE FRAUD CAUSE OF ACTION, WHEN THE TRIAL COURT GRANTED A JUDGMENT N.O.V. ON THE NEGLIGENT MISREPRESENTATION CAUSE OF ACTION, WITHOUT ORDERING A NEW TRIAL ON THE FRAUD COUNT.**

The trial court submitted the case to the jury on theories of fraud (Instruction No. 16a) (R.Vol. V, p. 1439–1440) and "negli-

gent misrepresentation" as defined by Instruction No. 40 (R.Vol. V, p. 1465–1466) and Instruction No. 43 (R.Vol. V, p. 1469) Copies of these instructions, and a side by side comparison of Instructions Nos. 16a and 40, are in the Appendix. Instruction No. 40 was given over the objection of Hudson. (Tr.Vol. 18, p. 3229–3330). The fraud instruction and the "negligent misrepresentation" instruction were essentially the same, except for the element of the Defendants' knowledge of the falsity. The fraud instruction stated, "that when the Defendants made the promise or representation, they knew it was false." The "negligent misrepresentation" instruction stated "that when Lyle Cobbs and Jack Kennevick made the statement, they acted negligently." Instruction No. 43 advised the jury of a party's duty to disclose known facts.

The negligent misrepresentation claims and the fraud claims as presented to the jury by the Court's instructions, are inherently intertwined and related. The trial court, in its instructions, drew two subtle distinctions between the causes of action—the burden of proof and whether or not Cobbs and Kennevick knew, at the time the representation was made, that it was false.

A majority of this Court, in the earlier opinion, accurately characterized the negligent misrepresentation cause of action, as submitted to the jury, as a "lesser included tort of fraud." The jury verdict in favor of Hudson on the negligent misrepresentation issue, and against Hudson on the fraud count, could have easily been accepted by those jurors who also believed that the evidence established fraud, as this finding had the same result, i.e., liability on the part of Cobbs and Kennevick. The proper standard for this Court is whether prejudice could have reasonably occurred, not whether prejudice actually occurred. *Roll v. City of Middleton*, 115 Idaho 833, (Idaho App.1989). If error was prejudicial and "it reasonably could have affected the outcome of the trial," then a new trial must be granted. *Pierson v. Brooks*, 115 Idaho 529, 534 (Idaho App.1989)

The jury's verdict in this case turned upon its interpretation of the subtle distinctions between the two torts. The jury concluded that Cobbs and Kennevick were grossly negligent. If the jury had not had this option, then we can only speculate as to what the result might have been. But a party's right to a fair trial, free from prejudicial error, should not be determined by speculation.

See pages 5–9 of Hudson's Memorandum In Response to Memorandum in Support of Respondents' Petition for Rehearing, in which this issue is discussed in more detail.

In order to provide Hudson with his constitutional right to a fair and impartial jury trial, this Court, at the very least, must adhere to its original opinion filed on August 11, 1989, reverse the judgment n.o.v. and remand the case for a new trial, free from the prejudicial error made by the trial court *on its own motion and over the objection* of Plaintiff and Defendants.

## CONCLUSION

The facts of this case and the applicable law mandate, and the interest of justice require, that this Court reverse the trial court's judgment n.o.v. and determine the following as a matter of law:

a. Whether the jury instructions given by the Court adequately covered the torts of negligent nondisclosure and/or constructive fraud.

b. If this Court concludes that either negligent nondisclosure or constructive fraud was adequately covered by the jury instructions given, then this Court determine whether the jury's answers to the interrogatories set forth in the special verdict establish that Defendants did commit the torts of negligent nondisclosure and/or constructive fraud. If this Court so determines that either such tort was committed by Defendants, the jury verdict should be reinstated.

c. If this Court finds that the jury instructions given did not adequately cover either the tort of negligent nondisclosure or the tort of constructive fraud, or that the jury did not find

that either of such torts was committed by Defendants, this Court should order a new trial, on the common law fraud, negligent nondisclosure and constructive fraud causes of action. In the alternative, this Court should remand to the trial court for the foregoing determinations.

DATED this 23rd day of July, 1990.

Respectfully submitted,
KENNETH & THOMAS
By FRED KENNEDY
Fred Kennedy, Of the Firm
Attorneys for Wayne D. Hudson
Plaintiff/Appellant

### CERTIFICATE OF MAILING

I HEREBY CERTIFY that on the 23rd day of July, 1990, I caused to be served a true and correct copy of the foregoing MEMORANDUM IN SUPPORT OF APPELLANT'S PETITION FOR REHEARING OF 1990 OPINION NO. 90 upon PETER J. BOYD and TODD J. WILCOX, Elam, Burke & Boyd, P.O. Box 1539, Boise, Idaho 83701, Attorneys for Lyle Cobbs, Jack Kennevick and Cobbs/Kennevick Partnership, by depositing same in the United States mail, postage prepaid, in an envelope addressed to said attorneys at the foregoing address.

FRED KENNEDY
Fred Kennedy

### APPENDIX TO APPELLANT'S MEMORANDUM

COMPARISON OF ELEMENTS OF INSTRUCTION NOS. 16a and 40 COVERING FRAUD AND NEGLIGENT MISREPRESENTATION

#### Instruction No. 16a

In order for the plaintiff to prevail on his fraud claim asserted against defendants Cobbs, Kennevick, and Mark Bazeghi, the plaintiff has the burden of proving each of the following propositions:

· 1. That the defendants made to plaintiff a statement or promise of existing fact;

2. That the promise or representation was false;

3. That the promise or representation was material under all the circumstances;

4. That when the defendants made the promise or representation, they knew it was false;

5. That the defendants intended that the plaintiff should act on the basis of the promise or representation in about the manner in which he did act;

6. That the plaintiff did not know that the promise or representation was false;

7. That the plaintiff did rely on the truth of the promise or representation in his subsequent actions;

8. That the plaintiff acted reasonably under all the circumstances in relying upon the promise or representation.

9. That the plaintiff suffered damages that were proximately caused by his reliance on defendants' promise or representation;

10. The nature and extent of the plaintiff's damages and the amount thereof.

R., Vol. V, p. 1439

#### Instruction No. 40

The plaintiff has the burden of proving all of the following propositions on his claim for negligent misrepresentation against Lyle Cobbs and Jack Kennevick:

1. That the leases signed by Lyle Cobbs and Jack Kennevick constituted a statement of past or existing facts to Wayne Hudson.

2. That the statement was false.

3. That the statement was material under all the circumstances.

4. That when Lyle Cobbs and Jack Kennevick made the statement, they acted negligently.

5. That Lyle Cobbs and Jack Kennevick intended that Wayne Hudson should act on the basis of the statement in about the manner in which he did act.

6. That Wayne Hudson did not know that the statement was false.

7. That Wayne Hudson did rely on the truth of the statement in his subsequent actions.

8. That Wayne Hudson acted reasonably under all the circumstances in relying upon the statement.

9. That Wayne Hudson suffered damages that were proximately caused by his reliance on Lyle Cobbs' and Jack Kennevick's statement.

10. The nature and amount of Wayne Hudson's damages, if any, that were proximately caused by the statement.

R.Vol. V, p. 1465

### INSTRUCTION NO. 16a

In order for the plaintiff to prevail on his fraud claim asserted against Defendants Cobbs, Kennevick, and Mark Bazeghi, the plaintiff has the burden of proving each of the following propositions:

1. That the defendants made to plaintiff a statement or promise of existing fact;

2. That the promise or representation was false;

3. That the promise or representation was material under all the circumstances;

4. That when the defendants made the promise or representation, they knew it was false;

5. That the defendants intended that the plaintiff should act on the basis of the promise or representation in about the manner in which he did act;

6. That the plaintiff did not know that the promise or representation was false;

7. That the plaintiff did rely on the truth of the promise or representation in his subsequent actions;

8. That the plaintiff acted reasonably under all the circumstances in relying upon the promise or representation;

9. That the plaintiff suffered damages that were proximately caused by his reliance on defendants' promise or representation;

10. The nature and extent of the plaintiff's damages and the amount thereof.

If you find from your consideration of all the evidence that each of these propositions has been proved *by clear and convincing evidence*, then your verdict should be for the plaintiff; but, if you find from your consideration of all the evidence that any of these propositions has not been proved *by clear and convincing evidence*, then your verdict should be for the defendant. However, the plaintiff does not have to prove the amount of his damages by clear and convincing evidence; the plaintiff need only prove the amount of damages by evidence that is more probably true than not.

If you find by clear and convincing evidence that a false representation was made to the plaintiff by one of these defendants as a result of a concerted action, then you need not find that all of these defendants made false representation to the plaintiff. It is sufficient for you to find by clear and convincing evidence that at least one of the defendants made a false representation as part of a common plan or scheme to defraud the plaintiff since all those who, in pursuance of a common plan or scheme to defraud, actively take part in the scheme or plan are equally liable as the defendant who actually made the false promise or representation.

### INSTRUCTION NO. 40

The plaintiff has the burden of proving all the following propositions on his claim for negligent misrepresentation against Lyle Cobbs and Jack Kennevick:

1. That the leases signed by Lyle Cobbs and Jack Kennevick constituted a statement of past or existing facts to Wayne Hudson.

2. That the statement was false.

3. That the statement was material under all the circumstances.

4. That when Lyle Cobbs and Jack Kennevick made the statement, they acted negligently.

5. That Lyle Cobbs and Jack Kennevick intended that Wayne Hudson should act on the basis of the statement in about the manner in which he did act.

6. That Wayne Hudson did not know that the statement was false.

7. That Wayne Hudson did rely on the truth of the statement in his subsequent actions.

8. That Wayne Hudson acted reasonably under all the circumstances in relying upon the statement.

9. That Wayne Hudson suffered damages that were proximately caused by his reliance on Lyle Cobbs' and Jack Kennevick's statement.

10. The nature and amount of Wayne Hudson's damages, if any, that were proximately caused by the statement.

If you find from your consideration of all the evidence that each of these propositions has been proved *by a preponderance of the evidence,* then your verdict should be for the plaintiff; but, if you find from your consideration of all the evidence that any of these propositions has not been proved *by a preponderance of the evidence,* then your verdict should be for the defendants.

### INSTRUCTION NO. 43

A duty to disclose known facts arises where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party.

Moreover, where one party is under no duty to speak, but nevertheless does so, he is bound to speak honestly and not to engage in misleading half-truths.

### PLAINTIFF'S REQUESTED JURY INSTRUCTION NO. 57

The plaintiff also claims that defendants Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick Partnership were negligent in signing the incomplete leases covering Suites 101 and 103 of the Wildwood Office Center and delivering the same to defendant Mark Bazeghi, knowing that Mark Bazeghi intended to present such leases to Idaho First National Bank and plaintiff when they knew, or should have known, that said Bank and plaintiff would rely on said leases, that they were negligent in failing to notify Idaho First National Bank and plaintiff of their intention not to be bound by said leases, and that defendant Lyle R. Cobbs was negligent in the

manner by which he failed to notify plaintiff and Idaho First National Bank of essential information in connection with the leasing of Suite 202 to The Professionals, Inc. Plaintiff also claims that such conduct on the part of defendants Lyle R. Cobbs, Jack Kennevick and the Cobbs/Kennevick Partnership was in wanton disregard of the rights of Idaho First National Bank and plaintiff and constituted gross negligence. Plaintiff alleges that he was damaged as a proximate result of such negligence on the part of said defendants.

GIVEN ___X___

REFUSED _____

MODIFIED _____

COVERED _____

OTHER _____

### PLAINTIFF'S REQUESTED JURY INSTRUCTION NO. 58

For the Plaintiff Hudson to establish that the Defendants Lyle R. Cobbs, Jack Kennevick or the Cobbs/Kennevick Partnership was negligent, the Plaintiff Hudson has the burden of proving each of the following propositions by a preponderance of the evidence:

1. That the defendants Lyle R. Cobbs, Jack Kennevick, and/or the Cobbs/Kennevick Partnership were negligent in connection with their participation, conduct or omissions in the leasing of office space in the Wildwood Office Center.

2. That the plaintiff Hudson was damaged.

3. That the negligence of the defendants Lyle R. Cobbs, Jack Kennevick and/or the Cobbs/Kennevick Partnership was a proximate cause of plaintiff Hudson's damages.

4. The nature and extent of plaintiff's damages, the elements of damage, and the amount thereof.

If you find from your consideration of all the evidence that each of the propositions has been proved by a preponderance of the evidence, *then your verdict should be for* the plaintiff; but, if you find from your consideration of all the evidence that any of

these propositions has not been proved, then your verdict should be for the defendant.

IDJ[ 270–1, as modified

GIVEN X

REFUSED \_\_\_\_

MODIFIED \_\_\_\_

COVERED \_\_\_\_

OTHER \_\_\_\_

# BAJI 12.36

## FRAUD AND DECEIT—NONDISCLOSURE OF KNOWN FACTS

Except as you may otherwise be instructed, where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose such known facts.

A duty to disclose known facts arises where the party having knowledge of the facts is in a fiduciary or a confidential relationship.

A fiduciary or a confidential relationship exists whenever under the circumstances trust and confidence reasonably may be and is reposed by one person in the integrity and fidelity of another.

[A duty to disclose known facts arises [in the absence of a fiduciary or a confidential relationship] where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party.]

### USE NOTE

The decisions enunciating the rule stated in the last paragraph are in cases involving nondisclosure by the seller. Whether the same rule would apply to a nondisclosure by the buyer is uncertain.

If last paragraph only is given, strike out inner bracket.